# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 32218

| | |
|---|---|
| SONS & DAUGHTERS OF IDAHO, INC., a nonprofit corporation; and USA BOXING, SNAKE RIVER, a nonprofit corporation, | )<br>)  Boise, February 2007 Term<br>)<br>)  2007 Opinion No. 36<br>) |
| Petitioners-Appellants, | )<br>)  Filed:  February 23, 2007 |
| v. | )<br>)  Stephen W. Kenyon, Clerk |
| THE IDAHO LOTTERY COMMISSION, | )<br>) |
| Respondent. | ) |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County, affirming the decision of the Lottery Commission.  Honorable Ronald J. Wilper, District Judge.

The decision of the Lottery Commission is <u>affirmed</u>.

Lynn E. Thomas, Boise; Iver J. Longeteig, Boise, for appellants.  Lynn E. Thomas argued.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent.  Jeremy C. Chou argued.

---

SCHROEDER, Chief Justice.

This appeal arises out of a petition for judicial review of a bingo license revocation.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Sons and Daughters of Idaho, Inc. (S&D) and United States Amateur Boxing Federation, Snake River Association (USAB) are nonprofit organizations licensed to conduct bingo games. The organizations conduct bingo through their bingo committees, both of which consist of the same two persons, Bill Tway and Bob Ford.  The bingo operations take place at a facility in Garden City informally known as "Big Bucks Bingo."  The organizations alternate days with each organization conducting bingo three days per week.  The organizations rent the building

and the non-gaming equipment such as tables, chairs and televisions on a per-day basis from Z&J Services, Inc., a for-profit corporation owned by Tway and Ford. Z&J does not provide any gaming equipment regulated under the bingo statutes. Tway and Ford serve on the bingo committees. They are not otherwise affiliated with USAB, but they are or have been involved with S&D as officers or directors.

The present dispute began with a request by the Idaho Lottery Commission ("Lottery" or "Commission") to inspect the records of each organization as authorized by I.C. § 67-7709(5). During the inspection Tway and Ford did not provide physical copies of the cancelled checks associated with the bingo operations, stating that the bank did not return cancelled checks. The Lottery thereafter sent notices of revocation to both S&D and USAB, which acted as complaints for purposes of initiating a contested case agency proceeding. With respect to S&D the revocation was based on allegations that Tway, as an officer of S&D, was being indirectly compensated from bingo proceeds through the payments to Z&J. With respect to USAB, the basis of the revocation was that bingo revenues were not being allocated in accordance with statutory requirements. Both organizations were accused of contracting with outsiders to conduct bingo games, and the notices stated that the organizations had "failed to provide the documents as required by statute and regulation" at the time of the inspection. During the proceedings the organizations executed releases allowing the Lottery access to their financial and banking records. The Lottery obtained copies of the cancelled checks at a cost of some $1500 to the Lottery.

After a revocation hearing, the hearing officer recommended that S&D's license be revoked based on the finding that the rent payments to Z&J constituted indirect compensation to Tway and Ford. With respect to USAB the hearing officer found that there was no violation because Tway and Ford were not officers or directors of the organization and all of the payments were within the statutory limitations. The hearing officer found that the games were not being conducted by Z&J but by Tway and Ford individually as the members of each organization's bingo committee. The hearing officer found that the organizations were not required to keep physical copies of the checks on the premises, and that their ability to retrieve the checks upon request was sufficient to satisfy the statute.

Both sides petitioned for reconsideration. The Lottery maintained that the hearing officer should have found that Z&J was conducting the bingo games. S&D represented that it had taken

2

curative action by restructuring the governing body of S&D so revocation was no longer appropriate. The hearing officer rejected both petitions, reiterating his earlier finding that Z&J was not actually conducting the bingo games, and noting that the issue of subsequent curative measures was not properly before the hearing officer in that proceeding.

The Commission agreed with the hearing officer that S&D had violated the prohibition on indirect compensation. The Commission ruled that both organizations had "failed to keep and account for all checks" as required by I.C. § 67-7709(1)(b) and that both licenses should therefore be revoked. The organizations filed a petition for judicial review in the district court. The district court affirmed, holding that the Commission provided adequate procedure and did not abuse its discretion or act arbitrarily. It also rejected several constitutional arguments raised by the organizations.

## II.
## STANDARD OF REVIEW

When a district court acts in its appellate capacity under the Idaho Administrative Procedure Act (IDAPA), this Court reviews the agency record independently of the district court's decision. *Cooper v. Bd. of Prof. Discipline of Idaho State Bd. of Medicine*, 134 Idaho 449, 454, 4 P.3d 561, 566 (2000). The standard of judicial review of an agency action is dictated by statute. An agency's order must be upheld by the reviewing court unless its decision (a) violates statutory or constitutional provisions; (b) exceeds the agency's statutory authority; (c) is made upon unlawful procedure; (d) is not supported by substantial evidence in the record; or (e) is arbitrary, capricious, or an abuse of discretion. § I.C. § 67-5279(3). The court defers to the agency's findings of fact unless they are clearly erroneous and does not substitute its judgment for that of the agency as to the weight of the evidence. I.C. § 67-5279(1); *Cooper*, 134 Idaho at 454, 4 P.3d at 566.

On questions of law the court generally exercises free review, although agencies are sometimes entitled to deference on questions of statutory construction. Because the Commission has been entrusted with administration of the bingo statutes, the Court may defer to its interpretation of the statutes so long as that interpretation is reasonable and not contrary to the express language of the statute. *See J.R. Simplot Co. v. Idaho State Tax Comm'n*, 120 Idaho 849, 862, 820 P.2d 1206, 1219 (1991). Nevertheless, "the ultimate responsibility to construe legislative language to determine the law" rests with the judiciary, and the underlying

3

consideration whether or not such deference is granted is to ascertain and give effect to legislative intent. *Mason v. Donnelly Club*, 135 Idaho 581, 583, 21 P.3d 903, 905 (2001); *Simplot*, 120 Idaho at 853-54, 820 P.2d at 1210-11. Accordingly, the Commission's reasonable construction of the bingo statutes is entitled to deference, but only to the extent the rationales supporting such deference are applicable under the circumstances. *See Simplot*, 120 Idaho at 862-66, 820 P.2d at 1219-23.

### III.
### THE COMMISSION'S FINDING THAT THE ORGANIZATIONS FAILED TO KEEP AND ACCOUNT FOR ALL CHECKS IS SUPPORTED BY THE RECORD

Contrary to the hearing officer's recommendation, the Commission revoked USAB's license on the grounds that it had "failed to keep and account for all checks and withdrawal slips" in violation of I.C. § 67-7709(1)(b). The same violation was found for revoking S&D's license as well. The statute states that "A licensed authorized organization shall keep and account for all checks and withdrawal slips, including voided checks and withdrawal slips." I.C. § 67-7709(1)(b).

The organizations did not maintain physical copies of all its checks on the premises and did not provide them on the day of inspection. The Lottery eventually obtained the checks from the bank using releases executed by the organizations. The Lottery incurred some $1500 in expenses to obtain the checks. It did not discover checks payable to "cash" until after it had commenced the revocation proceedings, at which point it was too late to include that fact as a separate basis for revocation in the charging documents.

The hearing officer concluded that there was no failure to provide documents since the checks eventually were provided. The hearing officer determined that the reason the organizations had no physical copies of the checks in their possession was that the banks did not return the checks, and that there was no evidence of concealment or obstruction. The hearing officer found that the organizations were in compliance with the statute:

> In this case, the evidence is clear that both organizations kept meticulous records of the cash in and out, and meticulous bank records of all transactions through the various bank accounts. The statutes must be read in context with practical business application. It is not necessary for the licensee to personally or physically retain actual possession of these items, so long as the items are safeguarded and maintained under sufficient control of the licensee so that they can be retrieved if needed. Where the items are retained by the licensee's bank,

4

and available to the licensee on request or order, this is sufficient to satisfy the requirement of [the] statute.

The Commission rejected the hearing officer's conclusion and found that the organizations had failed to keep and account for all checks.

The facts are not in dispute. Clearly the organizations did not keep copies of the checks and have them available for inspection. Equally clear is the reason the bank did not give the organizations copies of the checks -- the organizations did not ask the bank for them. The organizations shifted the burden and expense of obtaining the checks to the Lottery.

Idaho Code § 67-5248(1)(a) states that an order must include "a reasoned statement in support of the decision." The Commission did not explain its decision. However, an understanding of the decision is apparent from the facts. Idaho Code § 67-7709(5) states that all "financial books, papers, records and documents of an organization shall be kept as determined by rule of the state lottery and shall be open to inspection." The regulation requires that an accounting of revenues and disbursements be retained in a licensee's permanent records, along with a copy of each Charitable Contribution Acknowledgement Report Form. IDAPA 52.01.02.122.04. The actions of the Commission must be read in light of the suspect position of gambling in the State: "Gambling is contrary to public policy and is strictly prohibited except for the following: c. Bingo and raffle games that are operated by qualified charitable organizations in the pursuit of charitable purposes if conducted in conformity with enabling legislation." Idaho Constitution, Art. III, sec. 20(1)(c). See also Idaho Code § 67-7701:

> It is hereby declared that all bingo games and raffles in Idaho must be strictly controlled and administered, and it is in the public interest for the state to provide for the administration of charitable bingo games and raffles to protect the public from fraudulently conducted bingo games and raffles, to assure that charitable groups and institutions realize the profits from these games, to prohibit professionals conducting bingo games or raffles for fees or a percentage of the profit and to provide that all expenditures by a charitable organization in conducting bingo games and raffles are in the best interest of raising moneys for charitable purposes.

The public policy of the State is to assure that authorized gambling enterprises are scrutinized carefully. Instead of keeping or obtaining and producing the underlying records needed to fulfill the duty of scrutiny, the organizations told the Lottery to fetch the records at the Lottery's expense. The Commission acted within its authority and did not abuse its discretion in determining that the organizations failed to keep and account for all checks.

5

The organizations argue that the Commission never charged them with "failing to keep checks," but merely with "failing to provide documents." As the district court found, the notice was sufficient to satisfy the requirements of due process and IDAPA by providing "a short and plain statement of the matters asserted or the issues involved." I.C. § 67-5242(1)(c).

The organizations also argue that the decision to revoke USAB's license was motivated by bias or improper motive, in that the Commission had offered to settle if USAB severed all ties with Tway and Ford but, upon USAB's refusal, proceeded to revoke the license. The fact of selective enforcement, without more, is not *per se* arbitrary. *Young Elec. Sign Co. v. State ex rel. Winder*, 135 Idaho 804, 809, 25 P.3d 117, 122 (2001). The Lottery's decision to pursue revocation against USAB based on its belief that Tway and Ford were doing violence to the spirit of the law does not demonstrate the kind of animus that renders a decision-maker biased. *See Owsley v. Idaho Indus. Comm'n*, 141 Idaho 129, 137, 106 P.3d 455, 463 (2005).

**IV.**
**THE EVIDENCE SUPPORTS THE FINDING THAT TWAY AND FORD WERE BEING COMPENSATED AND ESTABLISHES THAT Z&J WAS CONDUCTING BINGO GAMES**

The hearing officer recommended that S&D's license be revoked based on his finding that it was in violation of I.C. §§67-7709(1)(c) and 67-7711(3), which prohibit officers and directors from being compensated out of bingo proceeds. Section 67-7709 regulates the use of bingo proceeds, and includes the following provision:

> Any proceeds available in a bingo account after payment of [statutorily permissible expenses] shall inure to the charitable or nonprofit organization to be used for religious, charitable, civic, scientific testing, public safety, literary or educational purposes or for purchasing, constructing, maintaining, operating or using equipment or land, or a building or improvements thereto, owned, leased or rented by and for the charitable or nonprofit organization and used for civic purposes or made available by the charitable or nonprofit organization for use by the general public from time to time, or to foster amateur sports competition, or for the prevention of cruelty to children or animals, provided that no proceeds shall be used or expended directly or indirectly to compensate officers or directors.

I.C. § 67-7709(1)(c). Section 67-7711, entitled "Licensing procedure," contains a similar limitation on compensation of officers and directors:

> The operation of bingo sessions or games or charitable raffles shall be the direct responsibility of, and controlled by, a special committee selected by the governing body of the organization. If the governing body has not appointed a

6

special committee, the members of the governing body shall be held responsible for the conduct of the bingo sessions or games or raffles. No directors or officers of an organization or persons related to them either by marriage or blood within the second degree shall receive any compensation derived from the proceeds of a bingo session or raffle regulated under the provisions of this chapter. An organization shall not contract with any person not employed by, or a volunteer for, the organization for the purpose of conducting a bingo session or raffle on the organization's behalf.

I.C. § 67-7711(3). Tway and Ford comprised the special committee referred to in section 67-7711(3) for both organizations. In the case of S&D, they were also officers or directors of the organization. The bingo committee positions filled by Tway and Ford were not paid positions within the organizations, and there was no allegation that Tway and Ford were embezzling or mishandling the funds. However, the hearing officer found that they were indirectly compensated from the bingo proceeds because some of the money was used to rent the equipment and the facility from Z&J, which was owned or controlled by Tway and Ford or their relatives. The Commission affirmed the recommendation and adopted the hearing officer's findings.

Although the hearing officer found a violation by S&D because of Tway's and Ford's positions in the organization, he found that the arrangement was permissible with respect to USAB. He expressly rejected the Lottery's allegation that Z&J was a "'management company' engaged in operating the games," finding instead that Z&J was involved merely as a renter of the building and equipment. He also noted that all of the workers at the bingo operation were either volunteers or were employed directly by the organizations and found that the games were conducted by Tway and Ford personally as members of the organizations' bingo committees. The fact that bingo proceeds were going to Z&J in the form of rent was found to be immaterial because the expenses did not exceed the statutory limits and no one associated with Z&J was an officer or director of USAB. Accordingly, while the Lottery prevailed on its indirect compensation claim against S&D, its claim that the organizations had contracted with another party to conduct bingo sessions on its behalf was rejected by the hearing officer. The Commission adopted and affirmed the recommendation that S&D's license be revoked based on the indirect compensation claim.

The factual details of the arrangement are complicated. Tway testified that the agreement, which is not written, is intended to comply strictly with the limitations in I.C. § 67-7709(1), which provides as follows:

7

(a) All funds received in connection with a bingo game . . . shall be placed in a separate bank account. No funds may be disbursed from this account except the charitable or nonprofit organization may expend proceeds for prizes, advertising, utilities and the purchase of supplies and equipment in playing bingo, taxes and license fees related to bingo, the payment of compensation, and for the purposes set forth below for the remaining proceeds.

. . .

(d) All gross revenues received from bingo games by a charitable or nonprofit organization must be disbursed in the following manner[:] . . . not more than sixty-five percent (65%) of the gross revenues shall be utilized for prizes in the charitable bingo game, not less than twenty percent (20%) of gross revenues shall be used for charitable purposes enumerated in this subsection and not more than fifteen percent (15%) of the gross revenues shall be used for administrative expenses associated with the charitable bingo game. . . . Two hundred fifty dollars ($250) or one-tenth of one percent (.1%) of annual gross revenues, as per the previous year's annual bingo report whichever is greater may be paid as wages for the conduct of any one (1) bingo session. Such pay shall be on an hourly basis and shall be directly related to the preparation, conduct of and cleaning following a bingo session. Such wages shall be part of the fifteen percent (15%) gross revenues used for administrative expenses.

Tway and Ford carefully control the prizes offered so that the prize payout remains very close to the 65% maximum. The expenses are also calibrated by agreement between the organizations and Z&J so that they usually equal exactly 15% of the proceeds. In theory, the equipment rental rates are set at some fixed rate, with the total discounted as necessary to bring the total expenses within the 15% statutory limit. Tway never affixed an actual number to that rate, stating only that the organizations pay "up to a reasonable amount, but not to exceed 15 percent." He thought commercial rental places would charge about two dollars per chair and seven dollars per table, which, with 100 tables and 400 chairs in the facility, would suggest a "reasonable" amount of $1500 per day to rent the equipment. But the actual payment is always determined by the excess of the 15% portion of revenues over all other administrative expenses because, as Tway explained, the bingo revenues are never high enough to raise the 15% level to anywhere near the "reasonable amount." In other words, after paying the actual costs of payroll and supplies and other third party expenses associated with each bingo session, Z&J simply takes whatever is left of the allowable 15% portion. The remaining 20% ostensibly goes to the organizations.

In addition to the equipment rent, Z&J also receives rent on the building, but it is not counted as an "administrative expense." Instead, building rent is paid on a day-to-day basis out of the organization's 20% take for that day's bingo session. This arrangement is designed to conform to the provision in I.C. § 67-7709(1)(c) allowing net bingo proceeds to be used not just

8

for charitable purposes but also for "purchasing, constructing, maintaining, operating or using equipment or land, or a building or improvements thereto, owned, leased or rented by and for the charitable or nonprofit organization and used for civic purposes or made available by the charitable or nonprofit organization for use by the general public from time to time."[1] The hearing officer found that a strict reading of I.C. § 67-7709(1)(a) affirmatively requires building rent to be taken out of the 20% net proceeds rather than being counted as part of the 15% administrative expenses, since the cost of facilities is not enumerated as a permitted expense in that section. The rental rate on the building is determined in a manner similar to the equipment rental. The theoretical rent is $650 per day but is limited by whatever the actual net proceeds are, less a guaranteed payment of $1500 per month to each organization. In other words, after paying out prizes and third party administrative expenses, the remaining 20% of bingo revenues is divided up between the organizations and Z&J, with the organization receiving the first $1500 in revenues, and then Z&J receiving the remainder, up to a total of $650 per day. Theoretically any excess over the $650 per day rent would remain in the hands of the organization, but Tway testified that this had never happened. The Lottery points to evidence suggesting that even if the potential rent were met in a given month, the excess would be applied to make up for the shortfall during other months, essentially ensuring that the organizations would never receive more than the guaranteed payment.

The net result of the whole arrangement is that each organization receives guaranteed payments totaling $18,000 per year, with nothing more, while Z&J realizes the entire net profit from the bingo operation, less the guaranteed amount of $36,000 per year. The hearing officer suggested as a very rough estimate that the combined annual gross revenues from bingo operations of the two organizations might average around $750,000 which, even after paying out prize distributions and actual third party expenses, places the "lions' share" of the profits in Z&J's hands. There was no evidence that the organizations are being misled or defrauded. The president of USAB testified that the organization was happy to sponsor the bingo games in order to receive the guaranteed payment.

---

[1] To demonstrate compliance with the condition in section 67-7709(1)(c) requiring that the building be available for public use from time to time, the organizations posted a sign behind the cashier's stand which reads, "THIS FACILITY IS AVAILABLE FOR PUBLIC USE FROM TIME TO TIME AT NO CHARGE. PLEASE SEE US FOR DETAILS." The hearing officer found that this was sufficient to render it "available" for purposes of the statute.

This is an arrangement that can be characterized as indirect compensation to Tway and Ford so far as Z&J is concerned. It is also an arrangement that runs afoul of the prohibition in I.C. § 67-7711(3) on contracting with outsiders to conduct bingo. That section provides that an organization "shall not contract with any person not employed by, or a volunteer for, the organization for the purpose of conducting a bingo session." The fact that Tway and Ford do not receive a paycheck from the organizations does not mean that they are volunteers working on behalf of the organization. Where a business transaction is alleged to be in violation of a statute, it is the substance of the transaction, not the form that controls. *Transp. Equip. Rentals, Inc. v. Ivie*, 96 Idaho 223, 224, 526 P.2d 828, 829 (1974) (quoting *Wood v. Sadler*, 93 Idaho 552, 555, 468 P.2d 42, 45 (1970)) ("We will not hesitate to pierce a device or form which is designed to circumvent the usury laws in order to reach the economic substance of a transaction."); *O'Bryant v. City of Idaho Falls*, 78 Idaho 313, 325, 303 P.2d 672, 678 (1956). The organizations are correct in that nothing in the statutes prevents Z&J from renting its building and equipment to the organizations, even if individuals with an interest in Z&J then use the building to conduct bingo as volunteers on behalf of the organizations. But in this case Z&J receives not rents, but bingo profits. The substance of the arrangement is that Z&J pays what is essentially a royalty to S&D and USAB in exchange for the use of their bingo permits. It appears the amount of the payment to Z&J has almost nothing to do with the organizations' usage of the equipment or the building but is driven entirely by bingo revenues. This fact indicates that "rent" is a label designed to obscure the fact that Z&J is conducting bingo on behalf of the organizations, and that it is in fact the organizations who are "renting" their licenses to Z&J. Z&J's interest in the bingo proceeds resembles an equity stake, not a landlord's claim as a creditor.

The definition of "conduct" is "to direct the course of; manage or control." American Heritage Dictionary of the English Language (4th ed. 2000). To say that the organizations, through their bingo committees, direct or manage the bingo operations makes no sense when it is clear that Z&J, not the organizations, ultimately bears the burden of managing the expenses and ensuring that the operation remains profitable. To the extent Tway and Ford exercised control over the expenses, they were doing so as agents of Z&J, not as agents of the organizations. This conclusion is consistent with the hearing officer's finding that Z&J carried virtually all of the business risk of the operation. Based on the undisputed findings that Z&J was receiving all of

10

the upside and bearing all of the business risk, with the organizations receiving only a guaranteed payment, the hearing officer's finding that Z&J was not "conducting" bingo is clearly erroneous.

This conclusion is bolstered by considering the bingo statutes as a whole. Section 67-7707 allows bingo to be conducted only by charitable and nonprofit organizations that meet the statutory requirements. Section 67-7701 declares that the bingo statutes are designed "to assure that charitable groups and institutions realize the profits from these games [and] to prohibit professionals from conducting bingo games or raffles for fees or a percentage of the profit." In the context of these provisions, it is clear that the prohibition on outsourcing bingo operations was intended to prevent an otherwise eligible organization from using its license in such a way as to enable unlicensed entities to circumvent the general prohibition on conducting bingo. *See also* I.C. § 67-7712(2)(c) (allowing revocation where a licensee has "knowingly caused, aided or abetted, or conspired with another to cause, any person to fail or refuse to comply with" the bingo statutes or regulations). A rule that a for-profit corporation may conduct bingo for profit on behalf of a licensed organization by designating its agents as "volunteers" of the licensed organization would render meaningless the prohibition on contracting with outsiders.

The hearing officer based his recommendation on the finding that Tway and Ford, as officers or directors of S&D, were indirectly compensated out of bingo proceeds by virtue of their ownership interest in Z&J. That finding may be upheld because the rent payments in this case are not really rent payments at all. A problem with focusing on the concept of indirect compensation is that it raises difficult issues regarding how far proceeds may be traced and the difficulty of intruding upon truly arms length transactions. However the problem with the arrangement in this case is that Z&J was being directly compensated for conducting bingo on behalf of the organizations. The violation applies equally to both S&D and USAB. It constitutes an alternate basis for upholding the revocation of USAB's license.

## V.
## CONSTITUTIONAL ARGUMENTS

### A.    Vagueness

The perceived vagueness complained of by S&D arises partly from the fact that the Commission relied on the theory of indirect compensation of officers and directors instead of the more direct violation of contracting with another entity to conduct bingo. Despite any confusion as to the proper legal theory, the facts in this case support a finding that the bingo statutes were violated. Any uncertainty as to whether the arrangement would be upheld under the statutes

11

resulted not from the statute itself, but from the efforts to operate at the very edge of legality. The lack of success does not indicate that the statute was vague.

### B. Unity in Subject and Title

S&D argues that I.C. § 67-7711 is invalid under Art. III, § 16 of the Idaho Constitution, which requires that "[e]very act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title." According to S&D, the derivative compensation provision in 67-7711(3) upon which the revocation was based is completely unrelated to "licensing procedure" which is what the section purports to regulate.

This argument is without merit. Contrary to S&D's assertion, it is not at all unexpected that a statute governing "licensing procedure" might specify some of the substantive conditions that must be satisfied in order for a license to issue. The derivative compensation and anti-outsourcing provisions, as conditions of licensure, are sufficiently related to licensing procedure to survive a constitutional challenge.

## VI.
## CONCLUSION

The decision of the Commission is affirmed on the bases set forth in this opinion. The Commission is awarded costs.


Justices TROUT, EISMANN, BURDICK and JONES **CONCUR**.