4 P.3d 561

James C. COOPER, M.D., License No. M–4567, Petitioner–Appellant,

v.

BOARD OF PROFESSIONAL DISCI-PLINE OF the IDAHO STATE BOARD OF MEDICINE, Respondent.

No. 25006.

Supreme Court of Idaho, Boise, January 2000 Term.

June 28, 2000.

Hawley, Troxell, Ennis & Hawley, Boise, for appellant. Merlyn W. Clark argued.

Uranga & Uranga, Boise, for respondent. Jean R. Uranga argued.

KIDWELL, Justice.

James C. Cooper, M.D., appeals from a decision of the district court, acting in its appellate capacity, affirming a decision of the Idaho State Board of Medicine's Board of Professional Discipline (the Board). The Board concluded that Cooper engaged in improper sexual conduct with a patient and imposed a six-month suspension of Cooper's license to practice medicine. We reverse.

## I.

### FACTS AND PROCEDURAL HISTORY

#### A. Procedural History.

The executive director of the Idaho State Board of Medicine filed a complaint against psychiatrist James C. Cooper charging that Cooper "used his position as a physician to engage in improper, inappropriate, unprofessional and unethical sexual contact or conduct" with his patient J.H. Specifically, the

complaint alleged that Cooper had a sexual encounter with J.H. in November 1995. The complaint charged that this conduct violated I.C. § 54–1814(7) and IDAPA 22.01.01.101.03.d (Board Rule 101.03.d) (both regarding failure to meet the standard of health care) and I.C. § 54–1814(22) and IDA-PA 22.01.01.101.04.d (Board Rule 101.04.d) (both regarding abuse or exploitation of a patient).[1]

The Board appointed attorney Steven F. Scanlin to be its hearing officer for the matter. At the two-day hearing, J.H. and her sister testified for the Board and ten witnesses testified for Cooper. The record also contained the deposition testimony of one witness specifically requested by the hearing officer.

Five months later, the hearing officer issued findings of fact, conclusions of law, and recommendations (Original Findings). The major finding was as follows:

> Dr. Cooper engaged in a sexually exploitive relationship with JH.... Dr. Cooper ... used his therapeutic relationship to inquire about her sexual activities. Even though he knew of her sexual feelings towards him, he continued to discuss issues of a sexual nature with her and allowed her into his house. He failed to diagnose and treat her psychiatric problems of sexual exploitation but rather became part of them. He also failed to take adequate precautions in treatment or in his personal contacts with her to prevent the exacerbation or furtherance of these problems. Eventually, Dr. Cooper became either a real or imagined lover to JH. He failed to address this problem but rather became part of it, as well as he failed to diagnose and treat her Borderline Personality Dis-

order (which probably came at least in part from sexually exploitive relationships) and, in this regard, may have exacerbated her condition.

Based on this finding, the hearing officer concluded that Cooper failed to meet the standard of health care and engaged in abuse or exploitation of a patient. He recommended, among other things, that Cooper receive a six-month suspension of his license.

Cooper moved for reconsideration, citing among other issues the hearing officer's failure to make a finding as to whether Cooper had sexual contact with J.H. as charged in the complaint. In response, the hearing officer issued amended findings of fact, conclusions of law and recommended order (Amended Findings). The conclusions of law were slightly expanded to include the following:

> Dr. Cooper took unjust advantage of JH by instigating and continuing a relationship with her over a five year period that inappropriately promoted feelings of sexual attraction by JH toward him, and of which he had knowledge, with disregard for her specific problems and vulnerability. This culminated in a sexual encounter on or about November 25[sic], 1995.[2]

The hearing officer also included more specific findings of fact, including findings that J.H. and Cooper had a sexual encounter on November 25, 1995 at Cooper's townhouse and that J.H. described Cooper's townhouse in great detail. He found J.H.'s depiction "of what happened to her being a sexual encounter" as more believable than Cooper's "denials that he had violated the 'boundaries' of the patient-physician relationship." He stated that J.H.'s calm and collected demeanor made her more believable than the nervous

---

1. Board Rule 101.03.d specifies that "[c]ommission of any act of sexual contact, misconduct, exploitation or intercourse with a patient" constitutes a failure to meet the standard of health care under I.C. § 54–1814(7). In *Levin v. Idaho State Board of Medicine*, 133 Idaho 413, 418, 987 P.2d 1028, 1033 (1999), this Court held that promulgation of Board Rule 101.03.d exceeded the authority of the Board of Medicine because it was not within the expression of I.C. § 54–1814(7).

 Board Rule 101.04.d specifies that "[c]ommission of any act of sexual contact, misconduct,

exploitation or intercourse with a patient" constitutes abuse or exploitation of a patient under I.C. § 54–1814(22). This Court held in *Levin* that Board Rule 101.04.d was not vague, overbroad, or in excess of the authority of the Board of Medicine as it related to a physician's relationship with a current patient. *Levin*, 133 Idaho at 417, 987 P.2d at 1032.

2. Both parties agree that the pivotal date was the day after Thanksgiving, November 24, 1995.

and emotional Cooper, who expressed "somatic complaints" of runny nose and headache. The hearing officer also opined that the results of tests administered by psychiatrist Richard Worst indicated that Cooper "had the capacity to engage in a sexually exploitative relationship" with J.H.

The Board, in its Findings of Fact, Conclusions of Law and Final Order (Final Order) unanimously adopted the hearing officer's amended findings and conclusions of law. It modified the recommended sanctions and specified that Cooper pay $12,373.65 in costs.

Cooper filed a petition for judicial review. The district court affirmed, concluding that there was sufficient evidence of sexual intercourse between Cooper and J.H. to support the Final Order. Cooper filed a timely notice of appeal.

### B. Facts and Testimony.

J.H., a junior in high school, was referred to a clinical social worker in March of 1990 because of difficulties with her schoolwork and with social interaction. J.H. had a history of being physically abused by her alcoholic father and had been sexually abused by older cousins. The clinical social worker diagnosed J.H. with Attention Deficit Disorder (ADD) and with Conduct Disorder because she had symptoms of alcohol and drug use, lying, and physical confrontations with family members. She referred J.H. to a psychiatrist for consultation and medication. The psychiatrist diagnosed J.H. with Attention Deficit Hyperactivity Disorder (ADHD) but stopped treatment because J.H. would not take her medication and was unwilling to follow his recommendations. The clinical social worker then referred J.H. to Cooper, a licensed psychiatrist at the Learning Disabilities Clinic (Clinic) at the Elks Rehabilitation Hospital.

Cooper first saw J.H. as a patient in November 1990. J.H. initially agreed to a course of psychotherapy with Cooper, but abruptly stopped treatment after three sessions. A month later, J.H. had another appointment with Cooper. She told him that she had left psychotherapy because she was attracted to him. Because neither J.H. nor Cooper believed that these feelings would interfere with medication management, they resumed a doctor-patient relationship limited to medication therapy and monitoring. The medication management continued on approximately a monthly basis until November 1995 except for a fifteen-month hiatus during J.H.'s pregnancy and its aftermath. On at least two occasions, Cooper recommended psychotherapy for J.H. and referred her to other mental health professionals in the Boise area, but J.H. did not follow up on the referrals.

At the Board's hearing, J.H. testified to the following events. In late 1994, when J.H. was divorcing her husband, Cooper started calling her about twice a month and having telephone sex with her. These phone calls became more frequent in the fall of 1995. She also had many personal meetings with Cooper at his office "behind his receptionist's back." Sometimes the receptionist would be there but J.H. would see Cooper when he didn't have appointments. On these occasions, J.H. would visit with Cooper from half an hour up to two hours at a stretch. In addition, sometimes Cooper would extend J.H.'s 15–minute office appointments up to an hour.

Cooper denied having personal phone calls or visits with J.H. either during or after business hours. Jackie Severt, Cooper's clinical secretary, testified that the office's physical layout made it impossible for anyone to get to Cooper's office without her knowledge. Cooper was rigorous in meeting his appointment times, Severt said, and she usually scheduled sixteen 15–minute appointments on each of the three half-days that Cooper worked at the Clinic.

J.H. testified that, at Cooper's request, she met Cooper at Ann Morrison Park in April 1995 and they talked about their mutual feelings for several hours. They met on a Wednesday afternoon, probably April 19. Cooper denied that this meeting took place and produced documentary evidence that he was in Hawai'i from April 18 through 25.

J.H. testified that Cooper invited her to his home many times. On June 9, 1995, she testified, she and Cooper met outside the Burlington Coat Factory by prearrangement

and she followed him to his house. This took place in the afternoon or early evening and she stayed, hugging and kissing Cooper, for up to an hour. Cooper wanted her to stay for dinner, but she declined because she had to pick up her boyfriend at the airport that evening.

Cooper denied J.H.'s account. He testified that he never invited J.H. to his home. Cooper and his friend Joan Uberuaga both testified that, on June 9, 1995, Cooper met Uberuaga at 6:00 p.m. at a downtown Boise restaurant. Both produced documentary evidence showing the dinner date. Cooper testified that, before November 1995, he only encountered J.H. outside a clinical setting once, when she parked next to his car at a grocery store and they exchanged pleasantries.

Cooper received a four-page handwritten letter from J.H. on November 20, 1995. It began with the explanation, "I want to get this off my chest, and my appointments don't give enough time." In the letter, J.H. claimed that she was not truthful when she told Cooper she quit therapy because she had sexual feelings for him. The letter continued with a rambling discussion of J.H.'s infatuation with Cooper going back to 1991, but did not mention any walks in the park, invitations to Cooper's townhouse, telephone sex, or long discussions.

Concerning events on the pivotal day of November 24, 1995, J.H. testified to the following events. Cooper invited her to his home for dinner on the day after Thanksgiving. She arrived around 6:00 p.m. as he was barbecuing dinner. They listened to music, talked about their relationship, ate a full dinner of salad, barbecued chicken, and barbecued beef, and drank two bottles of white wine and "a bunch of Baileys and coffee." They discussed having sex and decided to have unprotected sex. They went upstairs, J.H. took a shower in the upstairs bathroom, and they had intercourse. Cooper bit J.H.'s breasts so hard that they were covered with black bruises the next morning. After the sexual encounter, Cooper walked J.H. to her car and she left about 10:00 p.m.

Cooper's account of the events of November 24, 1995, differed drastically from J.H.'s rendition. Cooper testified that the doorbell rang about 2:30 p.m. When he opened the door, he saw J.H. looking very agitated. She opened the storm door and walked in the house without his permission, but Cooper did not stop her because J.H. had made comments indicating suicidal tendencies. J.H. sat down in the living room and asked for a drink, and Cooper brought her some water. J.H. talked about the difficulties of living with her sister's former sexual partner and expressed a desire to have a relationship with Cooper. He rejected the suggestion and told her to take responsibility for her own life. Eventually, J.H. calmed down and started talking about the art on Cooper's walls. She left after twenty to thirty minutes.

Cooper testified that he never ate dinner or had sex with J.H. Instead, following a longstanding tradition for the day after Thanksgiving, he had dinner with his family at the home of his ex-wife Phyllis. He was at Phyllis's house from 5:30 or 6:00 p.m. until 9:00 or 10:00 p.m. Two family members corroborated the claim of dinner with the family. In addition, a professional colleague testified that, in mid-December 1995, Cooper told him that he had a patient show up at his house.

J.H. testified that on the following day she went to her sister's house and showed her bruised breasts. J.H.'s sister corroborated this testimony, stating that J.H. arrived about 8:00 or 9:00 a.m. and told her the bruised breasts resulted from having sex with Cooper. J.H.'s then-boyfriend testified that J.H. showed him her bruised breasts "like right before Thanksgiving" and told him she caused the bruises while masturbating. In December 1996 or January 1997, the boyfriend said, J.H. changed her story and told him that she received the bruises while having sex with Cooper. On cross-examination, the boyfriend was asked if the showing of breasts might have been after Thanksgiving. He replied, "It could have, or it could have happened before."

J.H. stated that, after talking with her sister, she left a message on Cooper's home answering machine that she was upset and angry over the bruises. Her sister testified

that J.H. called Cooper from the sister's house. Cooper testified that he received an anonymous phone call on his home answering machine with a voice he recognized as J.H. He characterized the phone call as "[Y]ou assholes are all alike. I trusted you and you hurt me. You will be sorry."

On November 27, Cooper prepared a report about his November 24 encounter with J.H. that dovetailed with his testimony at the hearing. The report concluded, "Next visit, review appropriateness and refer for psychotherapy." The following day, Cooper prepared a report recording the Saturday phone call. He wrote that he would attempt to discuss the message during J.H.'s next visit. However, J.H. never returned to Cooper as a patient.

## II.

### STANDARD OF REVIEW

Where a district court acts in its appellate capacity pursuant to the Idaho Administrative Procedure Act (IDAPA), this Court reviews the agency record independently of the district court's decision. *Levin v. Idaho State Bd. of Medicine*, 133 Idaho 413, 417, 987 P.2d 1028, 1032 (1999); *Lamar Corp. v. City of Twin Falls*, 133 Idaho 36, 39, 981 P.2d 1146, 1149 (1999). The Court will defer to the agency's findings of fact unless those findings are clearly erroneous and unsupported by evidence in the record. *Lamar Corp.*, 133 Idaho at 39, 981 P.2d at 1149. This Court may not substitute its judgment for that of the agency as to the weight of the evidence on factual matters. I.C. § 67–5279(1); *Levin*, 133 Idaho at 417, 987 P.2d at 1032.

A strong presumption of validity favors an agency's actions. *See Lamar Corp.*, 133 Idaho at 39, 981 P.2d at 1149. The agency's action may be set aside, however, if the agency's findings, conclusions, or decisions (a) violate constitutional or statutory provisions; (b) exceed the agency's statutory authority; (c) are made upon unlawful procedure; (d) are not supported by substantial evidence on the record as a whole; or (e) are arbitrary, capricious, or an abuse of discretion. I.C. § 67–5279(3). In addition, this Court will affirm an agency action unless a substantial right of the appellant has been prejudiced. I.C. § 67–5279(4); *Lamar Corp.*, 133 Idaho at 39, 981 P.2d at 1149.

## III.

### ANALYSIS

**A. The Board Violated Cooper's Due Process Rights by Disciplining Him for Acts Which Were Not Charged in the Complaint.**

The Board issued findings that Cooper engaged in a sexually exploitative relationship with J.H., that he used the therapeutic relationship to inquire about and discuss her sexual activities, that he presented no evidence that sexual discussion was appropriate treatment for ADD or ADHD, that he failed to diagnose, treat, or prevent the exacerbation of her psychiatric problems of sexual exploitation, and that his failure to diagnose her Borderline Personality Disorder may have exacerbated her condition. It concluded as a matter of law that Cooper instigated and continued a relationship with J.H. that inappropriately promoted feelings of sexual attraction by J.H. toward Cooper. Cooper asserts that he was charged only with a single sexual encounter with J.H. He contends that the Board's findings and conclusions, by convicting him of acts which were not charged in the complaint, violated his due process rights.

The holder of a professional license has a valuable property right protected by the safeguards of due process. *H & V Eng'g, Inc. v. Idaho State Bd. of Prof'l Eng'rs*, 113 Idaho 646, 649, 747 P.2d 55, 58 (1987); *see also Abrams v. Jones*, 35 Idaho 532, 543, 207 P. 724, 726 (1922). In order to satisfy due process, the complaint must specify the particular acts of unprofessional conduct alleged. *Abrams*, 35 Idaho at 544, 207 P. at 726. The professional is not required to defend against or explain any matter not specified in the charges. *Id.* at 545, 207 P. at 726 (citing *In re Baum*, 32 Idaho 676, 687, 186 P. 927, 931 (1920)). IDAPA also requires "a short and plain statement of the matters

asserted or the issues involved." I.C. § 67–5242(1).

The Board's findings and conclusions concerning anything but the November sexual encounter are not justified by general language in the complaint, which alleged "improper, inappropriate, unprofessional and unethical sexual contact or conduct" with J.H. These charges "were couched in the most general terms, and [were] in fact but conclusions of law. . . . It is elementary that in any judicial or *quasi*-judicial proceeding, a pleading in the nature of an accusation or complaint must contain positive statements of the essential facts, and that it is insufficient where it merely states conclusions. . . . [The defendant] was entitled . . . to have the charges set out specifically, in order that he might have time and opportunity to prepare his defense." *Abrams*, 35 Idaho at 544, 207 P. at 726.

The only specific act charged was "a sexual encounter with Patient JH on or around November, 1995." However, the Board did not bring forward only evidence concerning the establishment of a physician/patient relationship and a sexual encounter in November 1995. It also elicited, during its case in chief, testimony that Cooper had a long-term inappropriate relationship with J.H. that included improper discussion of sex during medication therapy for ADD and ADHD, inappropriate use of the therapeutic relationship to pursue sexual objections, and inappropriate personal contact. Therefore, Cooper had only partial notice of the charges against him.

The Board insists that its findings and conclusions are merely a recitation of the facts and circumstances leading up to the November sexual encounter. This explanation is unpersuasive. Although the Original Findings made no finding at all of a November sexual encounter, the hearing officer concluded that Cooper had violated the standard of care and recommended discipline based on Cooper becoming "either a real or imagined lover to JH." The Amended Findings and Final Order made no fundamental changes to these findings, conclusions, or the recommended discipline. Rather, the hearing officer merely added findings that a sexual encounter occurred and enumerated the reasons for his credibility findings. Indeed, the "real or imagined lover" language remained in the Final Order.

▮ In a professional discipline case, a statement of only some of the specific acts alleged provides insufficient notice to the professional. *See Krueger v. Board of Prof'l Discipline*, 122 Idaho 577, 582–83, 836 P.2d 523, 528–29 (1992). In *Krueger*, the physician was charged with one specific act, inappropriate delay in performing a cesarean section in light of evidence of fetal distress. *Id.* at 582, 836 P.2d at 528. In this case Cooper was charged with one specific act: a sexual encounter with his patient J.H. in November 1995. Here, as in *Krueger*, the Board disciplined the physician for uncharged conduct which was related to, but not encompassed by, the specific act charged. In *Krueger*, the Board found clear and convincing evidence that the physician used inappropriate medications which caused fetal distress and concluded that his management of the delivery did not meet the standard of care. *Id.* Here, the Board found that Cooper engaged in a sexually exploitative relationship and concluded that Cooper instigated a five-year relationship with J.H. that inappropriately promoted sexual feelings towards him. In *Krueger*, this Court concluded that the complaint failed to adequately notify the physician of the charges and struck the Board's conclusion that Krueger's management of the case did not meet the standard of care. *Id.* at 582–83, 836 P.2d at 528–29. Here we do the same.

Because the Board did not provide Cooper with specific notice of all charges brought against him for which he was disciplined, it violated Cooper's due process rights.

**B. This Court Will Not Address Issues Not Raised Before the District Court.**

▮ Psychiatrist Richard Worst examined Cooper and performed a standard psychological test, the Minnesota Multiphasic Personality Inventory (MMPI). Worst testified that Cooper was unlikely to violate the boundaries of the physician/patient relationship. The raw results of the MMPI, along with scale interpretations for various classes

of patients taking the test, were admitted as an exhibit. The hearing officer quoted from the interpretation items and made a finding of fact that the test results indicated that Cooper had the capacity to engage in a sexually exploitative relationship with J.H. In addition, the hearing officer made a finding of fact that Cooper suffered from "somatic complaints" that affected his credibility. Cooper asserts that the hearing officer, who was not a physician or trained in psychology, was unqualified to make either of these findings. Cooper also contends that because the hearing officer was not a physician, he was statutorily unqualified under I.C. § 54–1806A(6)(d) to make findings of fact and conclusions of law on behalf of the Board.

Cooper did not raise these issues before the district court, which reviewed the case in its appellate capacity under IDAPA. "It is well settled that when a second appeal is taken, the appellants may not raise issues in the higher court different from those presented in the intermediate court." *Centers v. Yehezkely*, 109 Idaho 216, 217, 706 P.2d 105, 106 (Ct.App.1985) (per curiam). *Cf. Craven v. Doe*, 128 Idaho 490, 493, 915 P.2d 720, 723 (1996) (holding that, where an issue was raised and determined in magistrate court but not raised before district court acting in its appellate capacity, it was not preserved for appeal). Because Cooper did not raise these issues in his first appeal, this Court declines to address them.

**C. The Board's Finding That Cooper Had a Sexual Encounter with J.H. Is Not Adequately Supported by Substantial Evidence on the Record as a Whole as Required by I.C. § 67–5279(3).**

The Board found that J.H. accurately described Cooper's entire townhouse and that Cooper and J.H. had a sexual encounter in Cooper's townhouse on November 25 [sic], 1995. Cooper asserts that these findings are not supported by substantial and competent evidence.

■■■■ This Court defers to an agency's findings of fact unless those findings are

clearly erroneous and unsupported by substantial evidence in the record. *See Lamar Corp.*, 133 Idaho at 39, 981 P.2d at 1149; I.C. § 67–5279(3). However, this Court must look to the record *as a whole*, rather than referring to portions of the record in isolation. I.C. § 67–5279(3); *see also Gubler By and Through Gubler v. Brydon*, 125 Idaho 107, 110, 867 P.2d 981, 984 (1994); *Fuller v. State, Dep't of Educ.*, 117 Idaho 126, 127, 785 P.2d 690, 691 (Ct.App.1990). Evidence is substantial and competent only if a reasonable mind might accept such evidence as adequate to support a conclusion. *See Reiher v. American Fine Foods*, 126 Idaho 58, 60, 878 P.2d 757, 759 (1994). To establish whether an agency's action is supported by substantial and competent evidence, this Court must determine whether the agency's findings of fact are reasonable. *Industrial Customers of Idaho Power v. Idaho Public Utilities Comm'n*, 1 P.3d 786, 793 (2000). *Cf. United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948) (stating that a finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

■■■■ In this case, the record as a whole does not support the Board's findings. We decline to address the relative credibility of Cooper and J.H., as urged by Cooper. A review of the entire hearing transcript and the exhibits, however, reveals that J.H.'s testimony cannot be reconciled with exhibits and testimony from other witnesses. The Board did not find that the witnesses as to Cooper's activities on November 24 were not credible. Neither did it explain the discrepancies between J.H.'s testimony and the exhibits. Accordingly, the Board did not meet its burden of showing that Cooper violated I.C. § 54–1814(22) by having a sexual encounter with J.H.[3]

■■■■ J.H. testified that she was trained in interior design and acutely aware of her surroundings. J.H. and Cooper agree that J.H.

---

**3.** The proper burden of proof in physician discipline proceedings, as in attorney discipline cases,

is clear and convincing evidence.

was downstairs in Cooper's townhouse on November 24 for at least twenty minutes. She vividly and accurately described the layout of and art objects on the first floor. In contrast, when describing the second floor where she claimed the sexual encounter took place, J.H. was vague or mistaken. On request, she drew two different plans of the upstairs bedroom, placing the bathroom in a different location in each drawing. J.H. testified that she showered in a combined shower-tub and marked a "tub" in her drawing, but exhibits showed that Cooper's upstairs bathroom had only a shower stall. In the bedroom, J.H. remembered "some pictures" and seeing a picture in the hallway while lying on the bed. Photographs showed that no pictures in the hallway were visible from the location of the bed. When asked specifically if she remembered the bedroom wall covering, J.H. could not remember any covering. Photographs showed a conspicuous reindeer hide covering one bedroom wall. Nor did J.H. describe the two prominent portraits that hung over the bed. Because of these discrepancies, the finding that J.H.'s diagram and description of the upstairs bedroom was correct is not supported by the evidence.

 J.H. testified that she was at Cooper's townhouse about four hours, arriving around 6:00 p.m. and leaving after 10:00 p.m. In detail, she told how Cooper was barbecuing dinner as she arrived. She depicted the two of them eating a dinner of salad and barbecued beef and chicken, drinking two bottles of wine, consuming "a bunch of Baileys and coffee," and then having a sexual encounter.

Cooper's ex-wife Phyllis and daughter Tara, however, both testified that Cooper, following a longstanding family custom, went to Phyllis's house for a dinner of Thanksgiving leftovers. Phyllis testified that Cooper arrived about 5:30 or 6:00 p.m., ate dinner around 6:00 or 6:30 p.m., and stayed until 9:30 or 10:00 p.m. watching television. Phyllis stated that the family definitely would not have an early dinner. Tara gave substantially the same testimony. In addition, three witnesses testified that Cooper would never drink more than two glasses of wine in an evening.

After Phyllis and Tara testified, J.H. suddenly returned to the stand to modify her testimony. She testified that she had worked from 6:00 p.m. to 9:00 p.m. on November 24, and then went over to Cooper's house. She did not change her testimony regarding any of the other events of the evening.

The hearing officer made no finding that the testimony of Phyllis and Tara Cooper was not credible. In order to reconcile the two versions, Cooper must have invited J.H. to dinner on a day when he had an invitation to dine elsewhere, dined with his family at Phyllis's house at 6:00 p.m., watched television there until 9:30 p.m., then gone home, prepared barbecued chicken and beef, eaten another full dinner with J.H., and entertained J.H. for four hours. A reasonable mind cannot accept this version of events.

We emphasize that this Court is not usurping the Board's authority to make its own credibility determinations. We express no opinion as to the relative credibility of Cooper and J.H. We also recognize that it is rare for this Court to find that substantial and competent evidence does not support an agency's findings of fact. This is an unusual case. Because the Board did not make findings that reconciled J.H.'s account with the testimony of other witnesses concerning the events of the day on which the sexual encounter allegedly took place, the record as a whole does not support the finding that J.H. had a sexual encounter with Cooper. Therefore, we hold that the finding that Cooper had a sexual encounter with J.H. is not supported by substantial evidence on the record as a whole as required by I.C. § 67–5279(3).

## IV.

### CONCLUSION

The Board violated Cooper's due process rights by disciplining him for acts which were not charged in the complaint. In addition, the Board's finding that Cooper had a sexual encounter with J.H. is not adequately supported by substantial evidence on the record as a whole. Therefore, the decision of the Board is reversed. This Court will not address those issues raised for the first time

before it. We remand to the Board of Professional Discipline for dismissal of this disciplinary action. Costs to appellant. No attorney fees are awarded.

Chief Justice TROUT, Justices SCHROEDER and WALTERS and Justice Pro Tem HIGER concur.