# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41972

RICHARD J. PINES, D.O.,

    Petitioner-Appellant-Cross Respondent,

v.

IDAHO STATE BOARD OF MEDICINE,

    Respondent-Cross Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2015 Term

2015 Opinion No. 52

Filed: June 22, 2015

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Michael R. McLaughlin, District Judge.

The decision of the district court is <u>affirmed in part and vacated in part</u>. The case is <u>remanded</u> for further proceedings.

Cantrill Skinner Lewis Casey & Sorensen, LLP, Boise, for appellant. Daniel J. Skinner argued.

Uranga & Uranga, Boise, for respondent. Jean R. Uranga argued.

_____

J. JONES, Justice

Richard Pines appeals the district court's decision on a disciplinary order of the Idaho Board of Medicine (Board). The Board brought disciplinary proceedings against Pines following reports that he had induced young men into sexual contact by saying he was required to give full-body massages to naked practice patients in order to be relicensed as a doctor of osteopathy. Following a hearing, the Board found Pines committed four counts of professional misconduct. It revoked Pines' license and ordered that he pay costs and attorney fees. The district court affirmed the four counts of misconduct but vacated the award of costs and attorney fees. Pines appealed and the Board cross-appealed.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

1

Until recently, Pines practiced medicine in Idaho as a doctor of osteopathy (DO).[1] He was also board certified in psychiatry and child psychiatry, with his most recent recertification in 2011. This recertification required only an online exam and had no clinical component. Pines was also licensed as a foster parent for several years leading up to the complaint in this case, though that license was revoked as a result of the facts of this case. Pines' primary residence is in the Boise area, and he also owns a cabin in the Garden Valley area. These two residences are where the conduct at issue in this case occurred.

## A.    Conduct related to N.R. and Count I.

N.R. was in foster care from 2003 to 2004 and was formally placed in Pines' home for approximately eight months. From the time N.R. left Pines' care to the time he turned eighteen, the two had limited contact. Shortly after N.R. turned eighteen, he contacted Pines to inquire whether there was any work he could do for Pines for money. Pines told N.R. he had an important clinical exam approaching in connection with his osteopathic license and that he was required to give practice massages to "a full body subject." He asked if N.R. would act as his practice patient. N.R. testified at hearing that while he was younger and in Pines' care, Pines frequently gave him massages, during which N.R. would wear either a swimsuit or only a towel. Given this history, it is likely that Pines' request did not seem out of the ordinary. N.R. knew Pines was a physician and agreed to be Pines' practice patient.

The massage took place in Pines' bedroom where he had a sleeping bag on the floor for N.R. to lie on during the massage. Pines told N.R. to undress down to his shorts, and Pines started showing N.R. different muscle groups while massaging him. Pines then requested that N.R. remove the rest of his clothing, and Pines proceeded to perform a hernia/scrotal exam on N.R. Pines rationalized this conduct by telling N.R. he was also required to give hernia exams as part of his relicensing and that he would be able to conduct physical examinations after his test. N.R. testified he was very uncomfortable and began asking Pines medical questions to assure himself the contact was for a medical purpose. For this reason, N.R. asked Pines about a lump on N.R.'s scrotum. Pines checked the lump and told N.R. it was probably nothing serious. He said the lump was probably a build-up of semen collecting in the seminal vesicles. Pines testified that he used his skills as a physician to examine N.R.'s scrotum for lesions. On cross-examination, Pines' attorney suggested to N.R. that Pines essentially checked N.R. for hernias much the same

---

[1] In Idaho, there is no difference in the licenses issued to an MD and a DO. *See* IDAPA 22.01.01.010.09.

way as other physicians had checked N.R. in the past. N.R. testified that he agreed to this contact only because he believed Pines was required to practice on a test subject in connection with his osteopathic licensure. He further testified that he consented to the contact only for the purpose of acting as a practice patient and did not consent to let Pines touch him for sexual reasons.

**B.      Conduct related to D.P. and Count II.**

D.P. was in foster care from ages twelve to eighteen and went to Pines' home for respite care several times during those years. When D.P. was ages thirteen to fifteen, he was placed into Northwest Children's Home for children with behavioral problems. During that time, Pines was his treating physician and psychiatrist. D.P. testified that on one occasion when he was seventeen, Pines provided him with Adderall because D.P. had been prescribed this medication by another doctor but was out of it at the time. Additionally, D.P. testified that after he turned eighteen, Pines gave him drug samples of Zyprexa and Abilify.

Shortly after D.P. turned eighteen, he contacted Pines to ask for help with money to support D.P.'s child who would soon be born. Pines and D.P. went to dinner and Pines invited D.P. to stay the night in his home. That night, Pines asked D.P. if he was still having back and joint problems he had when he was younger. D.P. said he was, and Pines offered to give D.P. a massage to help with the issues. D.P. testified that when he was younger and in Pines' home for respite care, Pines sometimes gave him massages on his upper back and calves while D.P. was wearing a swimsuit. Therefore, Pines' offer likely did not seem out of the ordinary and D.P. agreed to let Pines massage him. D.P. testified that Pines massaged him, popped his back, rubbed his ligaments, and tried to get the blood flowing in his hands, feet, and thighs. D.P. was naked for this massage. Not long after the first massage, Pines said he could hire D.P. to do some work at his cabin. While there, Pines asked D.P. if he could give him a massage to practice for Pines' upcoming licensing exam, and D.P. agreed. During the massage, D.P. lied on the floor in Pines' bedroom, and Pines massaged the back of D.P.'s body with lotion. Pines then had D.P. turn over and Pines massaged the front of D.P.'s body. While massaging D.P.'s body, Pines grazed D.P.'s genitalia, and D.P.'s penis became semi-erect. Pines then put more lotion on his hands, grabbed D.P.'s penis, and masturbated D.P. D.P. testified he had not consented to sexual touching and that he "was surprised, shocked, ashamed, and confused, because [he] didn't know what to do."

**C.      Conduct related to S.G. and Count III.**

S.G. was in and out of foster care from ages seven to fifteen and was in Pines' home for

3

respite care several times. When S.G. turned eighteen, he contacted Pines to ask if he could do some work for Pines for money. Pines said he had work he could hire S.G. to do at his cabin. Before they went to the cabin, Pines mentioned to S.G. that Pines needed to have a practice patient for his licensing exams, though Pines did not explain any details. While they were at the cabin, Pines persistently brought up his need to practice on a patient for his license renewal. When S.G. was younger and in Pines' home for respite care, Pines gave him full-body massages, though S.G. was clothed for these massages. Therefore, S.G. likely did not find Pines' request out of the ordinary and he finally agreed to let Pines practice on him.

The massage took place on the floor of Pines' bedroom and S.G. was initially wearing only a towel. While S.G. was lying on his back, Pines opened the towel exposing S.G.'s genitals. Although Pines did not make any obviously intentional contact with S.G.'s genitalia, S.G. testified that Pines massaged S.G.'s groin area, that Pines was looking at S.G.'s genitalia during the massage, and that Pines brushed S.G.'s genital area. S.G. testified that he did not agree to let Pines touch him for sexual reasons.

## D.    Conduct related to B.H. and Count V.

B.H. was never in the foster care system but came to know Pines through a friendship with Pines' son. On one occasion after B.H. turned eighteen,[2] he went on a trip to Pines' cabin with Pines' family. On this trip, Pines asked B.H. if he would act as Pines' practice patient in connection with the renewal of one of his medical licenses. After B.H. agreed, Pines told him to undress and gave him a small towel to wrap around himself. Pines had B.H. lie on the floor in Pines' bedroom, and Pines lied on the floor next to him, lightly rubbing B.H.'s back.

Pines had B.H. roll over to his back and Pines knocked the towel loose. As Pines continued to massage the front of B.H.'s body, Pines touched B.H.'s genitals. B.H. described the contact as short of a full fondle, but that Pines seemed to be grazing B.H.'s genitals to gauge B.H.'s reaction. B.H. testified that he trusted Pines when Pines represented he needed to massage B.H. in connection with his relicensing, but he did not consent to let Pines touch his genitals.

## E.    Hearing result.

Pines' conduct with these young men was eventually reported to police, but no criminal charges were filed. However, the Board filed a complaint against Pines, alleging five counts of

---

[2] Because B.H. mistakenly provided the incorrect date of the conduct, the complaint alleged B.H. was a minor when it occurred. The Board concedes all four young men were over the age of eighteen at the time of these contacts.

4

professional misconduct.[3] The Board assigned a hearing officer, who conducted a contested hearing and made recommended findings of fact and conclusions of law (Recommendation).

The hearing officer reached essentially the same conclusion with respect to each count. The four counts at issue first alleged Pines violated statutes subjecting medical professionals to discipline if they engage in conduct constituting a crime of moral turpitude. The hearing officer found the statutes were applicable only if the victim was a "patient" of the medical professional. He found that none of the individuals were Pines' patients when the charged conduct occurred and, therefore, Pines did not violate the statutes. Each count also alleged that Pines violated an Idaho statute and accompanying administrative rule subjecting medical professionals to discipline if they engage in sexual conduct or exploitation with a patient, former patient, or in relation to the professional's practice of medicine. With respect to each count, the hearing officer concluded Pines violated the Board rule, not because the individuals were "patients," but because Pines' conduct was "related to his practice of medicine." He found that Pines made representations to each individual that the naked massages were necessary for Pines' relicensure and were, therefore, related to Pines' practice of medicine. He also found that each of the young men's testimony regarding their contacts with Pines was credible.

The Board issued findings of fact and conclusions of law (Board Findings), which differed significantly from the Recommendation.[4] It found all four young men were Pines' "patients" because each understood they were acting as practice patients for Pines' relicensing. Based on this finding, the Board concluded that Pines violated the statutes and rule at issue here. As a result of the violations, the Board revoked Pines' medical license and ordered him to pay the Board's costs and attorney fees. Pines appealed to the district court.

The district court affirmed the finding that the four young men were Pines' patients and the conclusion that Pines violated the statutes at issue. However, the court vacated the award of costs and attorney fees because it was not convinced the Board afforded Pines an opportunity to

---

[3] Counts I, II, III, and V involve the facts described above. There was a fifth count in the complaint, denominated Count IV, which alleged Pines inappropriately prescribed medication to a friend. The district court found there was no substantial evidence to support a finding of misconduct with respect to Count IV and the Board has not appealed this conclusion. Therefore, we do not address it.

[4] The Board stated that it "rejected the Hearing Officer's *Recommended Findings of Fact and Conclusions of Law* . . . issued on February 13, 2013." Pines reads the Board Findings as completely rejecting all the individual findings and conclusions within the Recommendation. However, in the course of its decision the Board cited and relied on many of the findings in the Recommendation, while specifically rejecting others. This simply shows the Board chose not to adopt the Recommendation in its entirety because it disagreed with *some* of the findings and conclusions. The Board did not reject every individual finding and conclusion made by the hearing officer.

be heard on the matter. Pines appealed the decision and the Board cross-appealed.

## II.
## ISSUES ON APPEAL

1.    Whether Pines was disciplined for uncharged conduct, resulting in a violation of his right to due process.

2.    Whether there is substantial evidence in the record to support the conclusion that Pines committed the violations alleged in Counts I, II, III, and V.

3.    Whether Pines' right to due process, as applied, was violated by the Board's conclusion that the four individuals were Pines' patients.

4.    Whether the district court erred in vacating the Board's order on attorney fees and costs.

## III.
## ANALYSIS

### A.    Standard of review.

A physician aggrieved by the Board's decision in a contested case may appeal to the district court.[5] *Haw v. Idaho State Bd. of Med.*, 140 Idaho 152, 157, 90 P.3d 902, 907 (2004); I.C. § 54-1806A(11); I.C. § 67-5270. Where, as here, the agency is required to issue an order, the party attacking the agency decision must show both (1) that the agency erred as specified in Idaho Code section 67-5279(3), and (2) that the party has had a substantial right prejudiced by the agency decision. *Williams*, 157 Idaho at 501–02, 337 P.3d at 660–61; I.C. § 67-5279(3)–(4).[6]

When reviewing a district court's appellate decision under IDAPA, we examine the agency record independently but ultimately decide whether the district court correctly ruled on the issues. *Peckham v. Idaho State Bd. of Dentistry*, 154 Idaho 846, 851, 303 P.3d 205, 210

---

[5] The Board is an "agency," which means it has the power to promulgate rules and decide contested cases. I.C. § 67-5201. "An agency may not revoke a license without providing an opportunity for a contested case. I.C. § 67-5254(1). A contested case is 'a proceeding which results in the issuance of an order.' I.C. § 67-5201(6)." *Williams v. Idaho State Bd. of Real Estate Appraisers*, 157 Idaho 496, 501 n.5, 337 P.3d 655, 660 n.5 (2014).

[6] I.C. § 67-5279(3)–(4) provides that:

> (3) . . . the court shall affirm the agency action unless the court finds that the agency's findings, inferences, conclusions, or decisions are:
>
>> (a)    in violation of constitutional or statutory provisions;
>>
>> (b)    in excess of the statutory authority of the agency;
>>
>> (c)    made upon unlawful procedure;
>>
>> (d)    not supported by substantial evidence on the record as a whole; or
>>
>> (e)    arbitrary, capricious, or an abuse of discretion.
>
> If the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings as necessary.
>
> (4) Notwithstanding the provisions of subsections (2) and (3) of this section, agency action shall be affirmed unless substantial rights of the appellant have been prejudiced.

(2013). The Court does not disturb an agency's findings of fact if supported by substantial evidence. *Id.* at 852, 303 P.3d at 211. Rather, we defer to agency findings of fact unless clearly erroneous. *Price v. Payette Cnty. Bd. of Cnty. Comm'rs*, 131 Idaho 426, 429, 958 P.2d 583, 586 (1998); I.C. § 67-5279(1). "Substantial evidence is more than a scintilla of proof, but less than a preponderance." *Pearl v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.*, 137 Idaho 107, 112, 44 P.3d 1162, 1167 (2002). In making factual findings based on its evaluation of the evidence, the Board may rely on its expertise, though such "expertise cannot serve as a substitute for necessary evidence." I.C. § 67-5251(5); *Peckham*, 154 Idaho at 852, 303 P.3d at 211. "The Board does not need to accept the hearing officer's factual determinations." *Pearl*, 137 Idaho at 114, 44 P.3d at 1169. But, where the Board's findings disagree with those of the hearing officer, we more closely scrutinize those findings, and the Board has a duty to explain why its findings differ. *Id.* at 112, 114, 44 P.3d at 1167, 1169. The Court exercises free review over questions of law, including the interpretation of statutes. *Williams*, 157 Idaho at 502, 337 P.3d at 661.

## B.    Introduction.

With respect to each young man, the complaint alleges Pines violated Idaho Code section 54-1814(21), which subjects one licensed to practice medicine to discipline for the "commission of any act constituting a crime involving moral turpitude." Idaho Code section 18-919 makes it a crime for one holding him/herself out as a physician or medical care provider to engage in sexual contact with a patient or client.[7] I.C. § 18-919(a). The conclusion that Pines is subject to discipline pursuant to these allegations requires a showing of the following elements:

(1)    that Pines was licensed to practice medicine, I.C. § 54-1814;

(2)    that Pines was acting or holding himself out as a physician or medical care provider,[8] I.C. § 18-919(a);

---

[7] Neither party has disputed the fact that Idaho Code section 18-919 constitutes a crime involving moral turpitude.

[8] A "medical care provider" is "a person who gains the trust and confidence of a patient or client for the examination and/or treatment of a medical or psychological condition, and thereby gains the ability to treat, examine and physically touch the patient or client." I.C. § 18-919(b)(2). Pines argues the Board failed to prove that the trust between Pines and these young men arose from the physician-patient relationship as required by subsection (b)(2), but it is clear from the record where the trust arose. There is no question in this case that each of the young men knew Pines was a physician. Pines conceded at oral argument that none of the young men would have allowed the contact to occur if they had not trusted that Pines was doing it for a medical purpose. Had Pines been a plumber and had the exact same foster-parent and other background with each young man, they no doubt would have refused Pines' requests to give them naked massages. Pines conceded as much at oral argument. This illustration shows that what allowed Pines to get the young men to consent to the contact was clearly the trust they had in him solely because of his role as a physician. Although there was a pre-existing relationship and pre-existing trust, that trust would not have been sufficient to allow Pines to engage in this contact had he not been known by the young men to

7

(3)   that he engaged in sexual contact,[9] *id.*;

(4)   with a patient or client, *id.*

With respect to each young man, the complaint alleges that Pines violated Idaho Code section 54-1814(22) and IDAPA 22.01.01.101.04.d. Section 54-1814(22) subjects a physician to discipline for "engaging in any conduct which constitutes an abuse or exploitation of a patient arising out of the trust and confidence placed in the physician by the patient." IDAPA 22.01.01.101.04.d provides that the "abuse or exploitation of a patient arising out of the trust and confidence placed in the physician by the patient" includes the "[c]ommission of any act of sexual contact, misconduct, exploitation, or intercourse with a patient or former patient or related to the licensee's practice of medicine."[10] The conclusion that Pines is subject to discipline pursuant to these allegations requires a showing of the following elements:

(1)   that Pines was licensed to practice medicine, I.C. § 54-1814;

(2)   that he engaged in conduct constituting an abuse or exploitation of a patient arising out of the trust and confidence placed in the physician by the patient, *id.* at (22);[11]

(3)   that he engaged in an act of sexual contact, IDAPA 22.01.01.101.04.d;

(4)   with a patient, former patient, or in connection with Pines' practice of medicine, *id.*

With respect to both sets of allegations, the primary dispute between the parties is whether the four young men were "patients" at the time the contact occurred.[12]

**C.    The Board did not rely on uncharged conduct to find the young men were patients.**

On three occasions in its decision the Board referred to the four young men generally as "minors." The district court did not specifically address the references by the Board to "minors."

---

be a physician. Therefore, because Pines is a physician and represented the contact was necessary because of that fact, there is no need to look elsewhere in this case for some source of trust.

[9] "Sexual contact" is defined as "the touching of an intimate part of a patient or client for the purpose of sexual arousal, gratification, or abuse, and/or the touching of an intimate part of a patient or client outside the scope of a medical examination or treatment." I.C. § 18-919(b)(3). An "intimate part" is "the sexual organ, anus, or groin on any person." *Id.* at (b)(1). With respect to S.G., Pines argues no sexual contact occurred. S.G. testified that Pines massaged his groin area and brushed his genitals. This qualifies as "sexual contact" based on the definitions above. Pines does not challenge the fact that he engaged in sexual contact with the other three young men.

[10] A "former patient" is one "for whom the physician has provided medical services or prescriptions within the last twelve (12) months." IDAPA 22.01.01.101.04.d.iii.

[11] The reasoning concerning the source of trust under Idaho Code section 18-919(b)(2) applies equally well to Idaho Code section 54-1814(22).

[12] No authority has been provided by either party as to whether this is a question of fact or of law. We find it to be a question of fact because the inquiry requires the taking of evidence and the evaluation of that evidence in order to determine whether each individual was a "patient." *See C.I.T. Corp. v. Elliott*, 66 Idaho 384, 397, 159 P.2d 891, 897 (1945).

8

Pines argues these inaccurate references to the young men's ages amount to a denial of due process because the Board relied on uncharged conduct that occurred before the young men turned eighteen, citing *Pearl*, 137 Idaho 107, 44 P.3d 1162; *Krueger v. Bd. of Prof'l. Discipline of Idaho State Bd. of Med.*, 122 Idaho 577, 836 P.2d 523 (1992).[13] He argues the *Pearl* Court held that even if the Board's conclusions were reached in part based on charged conduct, they must still be dismissed if also based on uncharged conduct. The Board concedes the references to "minors" were erroneous but argues such error is harmless. We agree with the Board on this issue.

A medical professional is entitled to due process in disciplinary proceedings, including the right to be notified of the allegations against him or her. *Pearl*, 137 Idaho at 114, 44 P.3d at 1169. In both *Krueger* and *Pearl*, the complaints alleged the physicians provided care below the local standard and in both cases the Board found the physicians had violated the standard of care. In *Krueger*, the complaint alleged a physician inappropriately delayed performing a C-section and, therefore, failed to meet the standard. 122 Idaho at 579, 836 P.2d at 525. In concluding the physician fell short of the standard, the Board relied on its findings that he used two types of medication that were inappropriate under the circumstances and that he mismanaged the delivery. *Id.* at 582, 836 P.2d at 528. On appeal, the Court held that because the complaint failed to adequately notify the physician he was charged with using inappropriate medication, he was denied the opportunity to prepare a defense to that claim and was, therefore, denied due process. *Id.* at 582–83, 836 P.2d at 528–29. The Court in *Pearl* made similar holdings, reversing the Board's conclusions that a physician violated the local standard where the Board relied in part on facts not alleged in the complaint. 137 Idaho at 114–15, 117, 44 P.3d at 1169–70, 1172.

Though it was inaccurate for the Board to refer to the young men as being "minors" at the time the contact occurred, this is harmless error. The age of any individual involved was irrelevant to a showing of any violation alleged in this case. The primary dispute is whether the four young men were Pines' "patients," and their ages have nothing to do with that analysis. It is apparent the Board knew this. In the section of the Board Findings concluding that "Dr. Pines'

---

[13] Pines makes a similar argument concerning the Board's references to "boys" throughout its decision. The district court found that "boys" can mean young men, and its use was not inappropriate. We agree. It is not inaccurate to call the young men in this case "boys," "kids," etc. Each young man was just over the age of eighteen at the time of the alleged acts, and some of them were still in high school. Throughout the proceedings, both parties have consistently referred to the young men in such terms. Pines cannot be permitted to make such references and then later complain that to do so is improper.

acts constituted crimes involving moral turpitude," the Board did not discuss any conduct that occurred when the young men were minors. Instead, it analyzed the requirements of I.C. §§ 18-919, 54-1814(21), and IDAPA 22.01.01.101.04.d and whether the young men were "patients." Although the Board's discussion of conduct that occurred when the young men were minors indicates it may have been distracted by those facts, the Board did not "rely on" those facts in concluding the young men were patients and the statutes were violated.

The Board's *discussion of* uncharged conduct in this case is distinguishable from the Board's *reliance on* uncharged conduct in *Pearl* and *Krueger*. Although the *Krueger* Court reversed the Board's conclusion that a physician fell short of the standard of care because the Board relied on uncharged conduct, the uncharged conduct on which the Board relied in that case—the fact that a physician used inappropriate medication on a patient—tended to affirmatively show the physician did not meet the local standard. Reversal was appropriate in that case because the uncharged conduct contributed to proving the alleged violation. Conversely, in the case at hand, although the Board discussed conduct that occurred when the young men were minors—such as Pines taking them on trips, buying them gifts, giving them massages, and changing into swimsuits in each other's presence—none of these facts work to affirmatively show or negate the fact that these young men were his patients. Although the Board discussed uncharged conduct, it did not rely on that conduct because the young mens' ages had no bearing in determining whether they were Pines' patients or whether Pines committed the alleged violations. Because the Board did not rely on uncharged conduct in making its conclusion, we are not persuaded by Pines' argument that he was denied due process in this respect. Therefore, the Board's error in referring to the young men as "minors" and its discussion of uncharged conduct is harmless error with respect to determining whether the statutes and rule were violated.[14]

**D.    Whether there is substantial evidence to support the Board's finding that all of the young men were "patients."[15]**

---

[14] Pines also argues that to the extent the Board relied on the finding that Pines had inappropriate conduct with minors, there is no evidence in the record to support these findings and the Board failed to meet its burden of proof as to these findings. Because the Board did not rely on such findings, we need not address these arguments.

[15] In a separate section of his brief, Pines argues the Board failed to meet its burden of proving its case by clear and convincing evidence, citing *Cooper v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.*, 134 Idaho 449, 456, 4 P.3d 561, 568 (2000). He makes arguments essentially identical to those made in arguing the findings are not supported by substantial evidence. In *Cooper*, the Court did not undertake any analysis regarding the burden of proof that was different than its analysis of whether there was sufficient evidence to support the Board's ruling. *See* 134 Idaho at 456–57, 4 P.3d at 568–69. Therefore, we do not separately address the burden of proof argument.

The Board found that "practice patients" are "patients" for the purposes of the statutes and rule at issue here. In so finding, the Board reasoned that:

> the Medical Practice Act and the relevant IDAPAs do not define the word "patient." Giving the word "patient" its usual and ordinary meaning, a "patient" is an individual who receives any professional services from the physician. The word "patient" should not be narrowly construed or dependent upon arriving at a medical office or paying for services rendered as many physicians go to their patients and accept what Medicare allows.

The Board also stated that a "patient" could be any "individual who receives some affirmative act on the part of a physician." To support its definition, the Board cited to USlegal.com's definition of "physician-patient relationship." It is unclear why the Board chose to resort to this source or why it did not also provide the definition of "patient" from the website. But, based on its definition of "patient" as one who receives an affirmative act from a physician, it found that when Pines induced the young men into massages under false pretenses and gave them the massages including sexual contact, his conduct amounted to affirmative acts, making the young men "patients."

Black's Law Dictionary defines "patient" as "[a] person under medical or psychiatric care." 1241 (9th ed. 2011). It defines "doctor-patient relationship" as "[t]he association between a medical provider and one who is being diagnosed or treated." *Id.* at 1402. This definition of "patient" was supported by testimony presented at the hearing. The Board's physician expert testified there is a doctor-patient relationship where a person uses his or her skills as a physician to make or rule out diagnoses. This witness further testified that providing medications to people creates a doctor-patient relationship. Pines' physician witness also testified to this fact. Both the Black's definitions and the physician testimony indicate a more limited meaning of "patient" than the Board applied. Because the Board misunderstood what "patient" means in the context of these statutes, we hold there is not substantial evidence to support the Board's blanket finding that all the young men were patients merely by virtue of their being "practice patients" who received "affirmative acts" from Pines. Circumstances surrounding the conduct with each young man must be addressed individually to determine whether each was a patient.[16]

---

[16] Pines argues the fact that he was not prosecuted for any offense in connection with his conduct bears on the issue of whether the young men were patients and whether a crime was committed. We find this argument unpersuasive. The evidence Pines cites in support of this argument is a police report and testimony by a police officer stating that the prosecutor declined to bring charges, in part, because "no doctor/patient relationship has been established." This evidence is not persuasive as to Pines' argument. A single prosecutor's opinion that there was not a physician-patient relationship is not binding on the Board or the Court. Additionally, there is no detail as to what information

11

**1.      N.R. was Pines' patient at the time of the sexual contact.**

Pines represented to N.R. that part of his licensing exam was to practice giving hernia/scrotal exams. During the scrotal exam, N.R. asked Pines about a lump and asked Pines to check it. Pines admitted that he used his skills as a physician to examine N.R.'s scrotum for lesions. He told N.R. the lump was likely a build-up of semen in the seminal vesicles and that it was probably nothing to worry about. On cross examination of N.R., Pines' attorney compared the scrotal examination to hernia exams N.R. had received in the past from other physicians.

When Pines administered the hernia/scrotal exam to N.R., he provided what would, under normal circumstances, be considered professional medical services. He used his skills as a physician to conclude that the lump was likely a build-up of semen. Likewise, he used his skills to rule out any number of other diagnoses that could be made in relation to a lump on one's scrotum. In analyzing the evidence before it, the Board used its expertise to find that a patient is not limited to one who comes to a physician's office to pay for health care. Although N.R. testified he did not think he was in a physician-patient relationship with Pines, N.R.'s perception of the relationship does not negate the Board's expertise on what causes one to fall within the definition of "patient," nor does it negate the testimonial evidence provided by physicians as to how the doctor-patient relationship arises. Because Pines used his skills as a physician to examine N.R.'s scrotum and to make and rule out diagnoses in connection with that examination, it is clear the Board's finding that N.R. was Pines' patient at the time of the sexual contact is supported by substantial evidence in the record.[17]

Because N.R. was a patient at the time of the sexual contact, Pines' conduct amounted to a violation of Idaho Code section 18-919, prohibiting a physician from engaging in sexual contact with a patient or client. Pines was, therefore, also in violation of Idaho Code section 54-1814(21), which subjects him to discipline for committing an act that constitutes a crime involving moral turpitude. Likewise, Pines was in violation of Idaho Code section 54-1814(22) and its accompanying administrative rule, IDAPA 22.01.01.101.04.d. Pines committed all the violations alleged in Count I. Therefore, we affirm the district court's decision on Count I.

was given to, or relied on by, the prosecutor in making the decision. And, Pines overlooks the fact that criminal prosecution for penal violations bears a more onerous standard of proof than civil proceedings such as this.

[17] This finding deviates from the Recommendation. However, the hearing officer simply found N.R. was not a patient but did not discuss and apply a standard for what it takes to be a "patient." The Board did discuss such a standard. Because the hearing officer did not discuss the specific facts that led to this finding concerning N.R., and because there is substantial evidence in the record to show that N.R. was a patient, we find the Board's duty to explain its deviation from the hearing officer's finding was met.

### 2. D.P. was Pines' patient at the time of the sexual contact.

On one occasion when D.P. was seventeen, Pines provided him with Adderall because he was out of this medication, which had been prescribed by a different doctor. Pines also provided drug samples of Zyprexa and Abilify to D.P. after he turned eighteen. By providing D.P. with medication, Pines was "treating" the maladies those medications were intended to address. Two physicians testified at the hearing that when a physician provides an individual with medication, the two are in a physician-patient relationship.

Because Pines had been treating D.P. in earlier years, he was aware that D.P. had suffered back and joint problems. Pines used that history in making his offer to give D.P. a massage. When Pines gave D.P. the initial massage, he used his skills as a doctor of osteopathy to try to address D.P.'s back and joint problems. Because Pines continued to provide D.P. with medication and gave D.P. a massage to help with D.P.'s back and joint problems, there is substantial evidence in the record to support the Board's finding that D.P. was Pines' patient at the time of the sexual contact.[18] Under the same analysis set forth with respect to N.R., because D.P. was Pines' patient at the time of the sexual contact, Pines was in violation of the statutes and rule alleged in Count II.[19] Therefore, we affirm the district court's decision on Count II.

### 3. Neither S.G. nor B.H. was Pines' patient at the time of the sexual contacts.

With respect to both S.G. and B.H., other than the massages Pines gave them under the false pretense that he was doing so to practice for a relicensing exam, there is no evidence to show that either of them was Pines' "patient." As discussed above, being "practice patients" is insufficient on its own to make the recipients of the practice massages "patients." Because neither of these young men were patients at the time of the sexual contact, Pines did not violate Idaho Code sections 18-919 or 54-1814(21) with respect to Counts III or V.

With respect to the allegations in Counts III and V that Pines violated Idaho Code section

---

[18] As with N.R., this finding deviates from the Recommendation. In finding that D.P. was not a patient, the hearing officer relied on the fact that Pines stopped being D.P.'s primary physician and psychiatrist when D.P. left the children's home. Although the hearing officer otherwise found D.P.'s testimony to be credible, he did not address in his findings D.P.'s testimony that Pines continued to provide him with medication. This was one of the reasons the Board found D.P. to be a patient. Because the Board relied on facts the hearing officer failed to address, the Board's reason for deviation is apparent, and its duty to explain such deviation on this finding is met.

[19] Count II additionally alleged that Pines violated Idaho Code section 54-1814(7) and IDAPA 22.01.01.101.03.d (later changed to 22.01.01.101.04.d) by providing health care to D.P. which failed to meet the local standard. In oral argument before the district court, the Board stressed it was not pursuing any allegations regarding the local standard of care. Neither the Board nor the district court specifically addressed this additional allegation. Therefore, we do not make any holding with respect to this additional allegation in the complaint, which was apparently abandoned by the Board.

54-1814(22) and IDAPA 22.01.01.101.04.d, further analysis is needed. With respect to these allegations, the hearing officer, Board, and district court all found that the massages and sexual contact were accomplished in connection with Pines' "practice of medicine."[20] *See* IDAPA 22.01.01.101.04.d. In making this finding, the Board turned to the definition of "practice of medicine" in Idaho Code section 54-1803, which provides:

> (1) The "practice of medicine" means:
>
>> (a) To investigate, diagnose, treat, correct or prescribe for any human disease, ailment, injury, infirmity, deformity or other condition, physical or mental, by any means or instrumentality;
>>
>> (b) To apply principles or techniques of medical science in the prevention of any of the conditions listed in paragraph (a) of this subsection; or
>>
>> (c) To offer, undertake, attempt to do or hold oneself out as able to do any of the acts described in paragraphs (a) and (b) of this subsection.

I.C. § 54-1803(1). Neither the Board nor the district court specifically explains how the definition in Section 54-1803(1) shows that Pines' conduct was related to his practice of medicine. Instead, the Board and district court simply make what they believe to be the logical conclusion that because the massages were given under the pretense that they were necessary for Pines to remain licensed to practice medicine, the massages were related to his practice of medicine. However, this fails to take into account the definition above.

The massages and sexual contacts do not amount to the "practice of medicine." Subsections (a) and (b) clearly contemplate the treatment of an actual malady as described in those sections. Likewise, because subsection (c) refers to holding oneself out as able to treat maladies as described in (a) and (b), subsection (c) also contemplates that there is an actual malady to address. Pines never represented to S.G. or B.H. that he was giving them massages to address any actual malady. Although they both knew Pines was a physician, this knowledge does not change the fact that neither of them appear to have had any actual malady Pines purported to treat with the massages. Therefore, in giving the massages, Pines was not holding himself out as able to treat an actual malady as required by subsection (c). Because Pines' conduct did not amount to the "practice of medicine" with respect to either S.G. or B.H., he did not violate Idaho

---

[20] The same finding was made with respect to N.R. and D.P. However, because we find they were Pines' "patients," it is unnecessary to consider whether Pines committed violations in connection with his "practice of medicine" concerning those two individuals.

14

Code section 54-1814(22) or IDAPA 22.01.01.101.04.d as alleged in Counts III and V. Therefore, we vacate the district court's decision on those counts.

**E.      Whether the statutes and rule denied Pines due process, as applied by the Board.**

Pines argues the Board's order violates his right to due process in the way it applies the statutes and rule in this case because the language in the statutes and rule precluding sexual contact with a "patient" did not provide adequate notice that Pines' conduct was proscribed.

A statute "is void for vagueness if its prohibitions are not clearly defined." *State v. Korsen*, 138 Idaho 706, 711, 69 P.3d 126, 131 (2003) (abrogated on other ground by *Evans v. Michigan*, 133 S.Ct. 1069 (2013)). "To succeed on an 'as applied' vagueness challenge, a complainant must show that the statute, as applied to the defendant's conduct, failed to provide fair notice that the defendant's conduct was proscribed" or that there were insufficient guidelines for the body charged with enforcing the statute so that body had unbridled discretion in determining whether there was a violation. *Id.* at 712, 69 P.3d at 132. This doctrine is applicable to statutes subject to regulation by an agency, even if no criminal sanctions are possible under the statute. *Tuma v. Bd. of Nursing*, 100 Idaho 74, 79, 593 P.2d 711, 716 (1979).

Pines was not denied due process. With respect to the allegations involving N.R. and D.P., a person of ordinary intelligence would have known that providing medication and using one's skills as a physician to diagnose or treat would have created a doctor-patient relationship. Pines should have known that when he examined the lump on N.R.'s scrotum, told him it was probably a build-up of semen, and told him it was not anything to worry about, N.R. was a "patient" within the contemplation of the statutes. Likewise, he should have known that when he continued to provide medication to D.P. and offered to give D.P. a massage to help with his back and joint problems, D.P. was a patient. Because Pines should have known his conduct created the doctor-patient relationship, Pines had adequate notice that his sexual contact with both N.R. and D.P. was proscribed, and there was no due process violation in this respect.

Because we hold that neither S.G. nor B.H. was Pines' patient and that Pines did not commit the violations alleged in Counts III and V, we need not address whether there was a due process violation with respect to either of those counts.

**F.      The case is remanded for further proceedings.**

Because we vacate the misconduct holdings with regard to S.G. and B.H., we also vacate the disciplinary order against Pines. The case is remanded to the district court for further remand

15

to the Board. On remand, the Board can consider the appropriate discipline, based on the charges this Court has upheld. In conducting its proceedings on remand, the Board must be mindful that "due process entitles a person to an impartial tribunal." *Park v. Banbury*, 143 Idaho 576, 581, 149 P.3d 851, 856 (2006). The language employed in the Board Findings is of concern in this regard. The Board denounced the hearing officer, having concluded that he "immeasurably failed to comprehend the principal issues in this case." The Board then proceeded to passionately rail against Pines' conduct saying, among other things, "Dr. Pines' egregious conduct was so corrupt and degenerate as to shock the conscience. . . ." While it is true that Pines conducted himself in a reprehensible manner, taking advantage of young men with troubled pasts, a tribunal does not give the impression of impartiality when it employs heated rhetoric and denunciations. Rather than playing to an audience, the job of the impartial tribunal is to deal with the facts and issues at hand in a professional manner.

Because of our disposition of the case, there is no need to address the issue of attorney fees and costs. That issue can be taken up by the Board on remand.

## IV.
## CONCLUSION

We affirm the district court's decision on Counts I and II, vacate the district court's decision on Counts III and V, and remand the case for consideration of the appropriate discipline in light of today's holding. The issue of costs and attorney fees may also be addressed on remand. No costs are awarded on appeal.


Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.

16