IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 43125-2015

ROBERT MICHAEL MENA, M.D.,          )
                                    )          Boise, February 2016 Term
    Petitioner-Appellant,          )
                                    )          2016 Opinion No. 32
v.                                  )
                                    )          Filed: March 23, 2016
IDAHO STATE BOARD OF MEDICINE,      )
                                    )          Stephen W. Kenyon, Clerk
    Respondent.                    )
                                    )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County.  Hon. Gerald F. Schroeder, Senior District Judge.

The appellate decision of the district court is <u>reversed</u>.

Daniel E. Mooney, Hawley Troxell Ennis & Hawley, LLP, Boise, argued for appellant.

Jean R. Uranga, Uranga & Uranga, Boise, argued for respondent.

_____

EISMANN, Justice.

    This is an appeal out of Ada County from an appellate decision of the district court upholding action taken by the Idaho State Board of Medicine against the appellant physician. We reverse the decision of the district court.

**I.**
**Factual Background.**

    Robert M. Mena was licensed to practice medicine and surgery in Idaho on September 13, 2003.  In 2007, staff members at the hospital in Jerome where he had privileges reported behaviors that suggested to them that Dr. Mena may be abusing drugs or alcohol.  There were also complaints about his record keeping, late dictations, and possible inadequate medical care.

    Dr. Mena was evaluated at the Betty Ford Center in Rancho Mirage, California, and its staff found no evidence of chemical dependency.  However, in its March 2007 report, the staff

expressed concern about Dr. Mena's psychological status and was of the opinion that he was not currently fit to practice medicine. The staff identified co-dependency issues and burnout and recommended that he enter the Bridges to Recovery rehabilitation center in Bowling Green, Kentucky for further evaluation and treatment.

Dr. Mena entered the Bridges to Recovery program in March 2007. There was a consensus that he was suffering from burnout. It recommended that he take a vacation and limit himself to a 40-hour workweek. He had also been diagnosed with sleep apnea and was using a C-PAP machine regularly.

In May 2007, the Jerome hospital referred Dr. Mena to the Center for Personalized Education for Physicians ("CPEP") in Denver, Colorado, to see if he had a medical or psychiatric condition that could impact his ability to safely practice medicine. The program recommended further neuropsychological testing, but it supported his return to work in a clinic-based setting with supervision. It noted that the hospital in Jerome had also recommended a separate evaluation of Dr. Mena's clinical skills and fund of knowledge.

In August 2007, CPEP referred Dr. Mena to Dr. Beaver in Boise for neuropsychological testing. He conducted a neuropsychological evaluation of Dr. Mena and issued a written report dated September 14, 2007. His testing did not identify any neurocognitive deficits. With respect to Dr. Mena's fitness to return to the practice of medicine, Dr. Beaver stated, "I would note his neurocognitive performance does not see any specific limitations that would result in a significant curtailment of his practice." However, Dr. Beaver recommended that Dr. Mena limit his practice "to truly a 40-50 hour workweek."

In December 2007 and February 2008, Dr. Mena attended the Physician Assessment and Clinical Education Program ("PACE") at the University of California, San Diego, to evaluate his clinical skills and fund of knowledge in family medicine. The evaluators concluded that he had significant deficiencies in his approach to obstetrics. The program recommended that he either discontinue his involvement in obstetrics or pursue an intensive, hands-on training course or fellowship program to update his knowledge base.

The Idaho State Board of Medicine ("Board") also had begun an investigation regarding Dr. Mena's training and ability to perform certain medical procedures, including the practice of obstetrics and the treatment of chronic pain. The Board and Dr. Mena entered into a Stipulation and Order dated July 16, 2009, in which he admitted that he had violated the Medical Practice

2

Act by failing to provide health care that met the required standard and in which he agreed to specific conditions of probation and restrictions on his license to practice medicine. The restrictions included that he would "permanently cease performing obstetrics and shall no longer treat chronic pain patients," that he "shall not work more than 40 hours per week," and that he "shall continue in treatment with a Board approved counselor and psychiatrist and shall follow their recommendations on continued treatment and medication." On September 26, 2011, the Board issued an order terminating the Stipulation and Order.

On September 26, 2011, the hospital in Jerome gave Dr. Mena written notification that it had granted him limited medical privileges on the condition that he obtain additional training, that he had failed to do so, and that his privileges were forfeited. On October 11, 2011, the Board sent Dr. Mena a letter asking him to respond to the hospital's action. He eventually submitted a thirteen-page written response that was rambling and disjointed. It contained many obscure references, grammatical and syntax errors, and vague sentences, and it appeared directed to his conduct that led to the 2009 stipulation.

Due to the nature of Dr. Mena's written response, on May 15, 2012, the Board appointed an examining committee pursuant to the Disabled Physician Act, which permits the Board to restrict, suspend, or revoke the license of a physician to practice medicine in this state if the physician is unable to practice medicine with reasonable skill or safety to patients because of mental illness, physical illness, or excessive use or abuse of drugs, including alcohol. In June, 2012, the committee issued its report concluding that Dr. Mena can continue his present practice of medicine with reasonable skill and safety if he has repeat neuropsychological testing, continues his outpatient psychiatric care, and is reevaluated in two years, with continuing Board oversight.

Dr. Mena underwent another neuropsychological examination by Dr. Beaver, who issued a report dated September 10, 2012. In it, he noted that Dr. Mena had been engaged in individual counseling over the prior several years and had been on antidepressant/anti-anxiety medication and that Dr. Mena's psychiatrist and psychologist both reported that Dr. Mena was doing well and that they saw no difficulties. Dr. Beaver concluded in his report that from a neurocognitive perspective, he "did not observe any neurocognitive deficits that would interfere with [Dr. Mena's] capacity to engage in clinical practice as a family practice physician."

3

On May 21, 2013, the Board appointed a hearing officer based upon "allegations" against Dr. Mena that "warrant a hearing to determine whether the physician's license issued to him should be revoked, suspended or otherwise restricted." After receiving oral and written testimony, the hearing officer issued his Recommended Findings of Fact and Conclusions of Law on November 14, 2013. He concluded, based upon the evidence, that "some level of impairment exists" with respect to Dr. Mena and that the Board could, in its discretion, issue an order under the Disabled Physician Act. The hearing officer did not identify what the impairment was or find that the level of impairment had any impact upon Dr. Mena's ability to practice medicine with reasonable skill or safety to patients.

The Board issued its Final Order on January 7, 2014. In its order, the Board found "that there is clear and convincing evidence that [Dr. Mena] suffers from 'some level of impairment,'" and it stated that "sanctions were necessary upon [Dr. Mena's] license." It ordered eleven specific "sanctions" to Dr. Mena's license to practice medicine.

Dr. Mena filed a motion for reconsideration, which the Board denied. In doing so, the Board wrote:

> Upon deliberation, the Board again determined there was clear and convincing evidence that [Dr. Mena] suffers from 'some level of impairment' that may impact his provision of medical care with reasonable skill and safety. The Board, upon the Committee on Professional Discipline's recommendation, deemed the conditions provided in the Final Order were essential to assure Idaho's public health, safety and welfare.

Dr. Mena filed a petition for judicial review. The issues that he raised to the district court were: (1) the Board initiated proceedings pursuant to the Disabled Physician Act and then imposed sanctions that were not permitted by that Act; (2) the Board's order was not supported by substantial evidence; and (3) the hearing officer erred in holding that certain evidence was inadmissible. The district court upheld the Board's action, and Dr. Mena then appealed to this Court.

## II.
### Did the District Court Err in Holding That the Board's Action Was Supported by Substantial Evidence?

Dr. Mena contends that the Board instituted proceedings under the Disabled Physician Act, but then imposed sanctions as if this was a medical discipline proceeding. Proceedings

4

under the Disabled Physician Act and proceedings for medical disciplinary enforcement are two separate proceedings.

**History of statutory proceedings for medical discipline.** In 1899, the legislature first enacted legislation to regulate the practice of medicine and surgery. 1899 Idaho Sess. Laws 345, 345-50. The legislation granted the governor the authority to appoint a board of medical examiners which, among other things, had the authority to institute proceedings in the district court if it determined that the license of a physician or surgeon should be suspended, revoked, or canceled for "unprofessional or dishonorable conduct." Secs. 7, 9, 1899 Idaho Sess. Laws 345, 348-49. The legislation listed eight actions that would constitute unprofessional or dishonorable conduct. Sec. 7, 1899 Idaho Sess. Laws 345, 348.

In 1919, the legislature abolished the board of medical examiners and vested its powers in the department of law enforcement. Ch. 8, §§ 31, 51, 1919 Idaho Sess. Laws 43, 59, 69. In 1929, the legislature expanded to fourteen the list of grounds for which the department of law enforcement could revoke or suspend a license of a physician or surgeon and set forth the procedures for doing so. Ch. 178, § 1, 1929 Idaho Sess. Laws 313, 313-17.

In 1949, the legislature repealed the statutes regulating the practice of medicine and enacted new legislation. Ch. 23, §§ 1-16, 1949 Idaho Sess. Laws 27, 27-41. The legislation created the state board of medicine in the department of law enforcement. Ch. 23, § 5, 1949 Idaho Sess. Laws 27, 31. The state board was given the power to establish rules and regulations to carry out the provisions of the legislation, to determine whether an applicant should be granted a license to practice medicine and surgery, and to determine whether grounds existed to revoke or suspend such license. Ch. 23, §§ 6, 7, 10, 11, Idaho Sess. Laws 27, 32-39. The grounds for revocation or suspension of a license were essentially the same as they had been under the 1929 legislation. Ch. 23, § 10, 1949 Idaho Sess. Laws 27, 35-36.

In 1969, the board of medicine was removed from the department of law enforcement, although the commissioner of law enforcement was made an ex officio member of the board. Ch. 84, § 5, 1969 Idaho Sess. Laws 237, 242. Other amendments were made to the statutes regulating the practice of medicine and surgery, including revising the list of actions that could be grounds for revocation or suspension of a practitioner's license. Ch. 84, § 10, 1969 Idaho Sess. Laws 237, 249-53.

In 1976, the legislature enacted Idaho Code section 54-1806A, which authorized the board of medicine to create a board of professional discipline and delegate to it the role and authority for medical discipline. Ch. 293, § 1, 1976 Idaho Sess. Laws 1011, 1011. The statute set forth the powers of the board of professional discipline and the procedures it was to follow. *Id*. at 1011-17. It also provided that the board of professional discipline could adjudicate disciplinary proceedings and, if grounds were found to exist, it could revoke, suspend, or restrict the physician's license and impose conditions of probation. *Id*. at 1013-16.

In 1977, the state board of medicine was established in the department of self-governing agencies, and the director of the department of law enforcement was made a member of the board. Ch. 199, § 6, 1977 Idaho Sess. Laws 536, 540. The legislature also repealed most of the statutes regulating the practice of medicine and surgery, including the statutes regarding medical discipline, with the exception of Idaho Code section 54-1806A, and it enacted new statutes to replace them. *Id*. §§ 1-14 at 536-48. The list of grounds for medical discipline set forth in newly enacted Idaho Code section 54-1814 included most of the grounds set forth in the repealed comparable statute. *Id*. § 14 at 547-48. In 1990, the legislature amended section 54-1806A to permit the board of professional discipline to impose an administrative fine of up to $10,000 and to assess costs and attorney fees against a physician found subject to medical discipline, in addition to the other sanctions available. Ch. 106, § 2, 1990 Idaho Sess. Laws 213, 217. In addition, the legislature increased the size of the board of medicine from eight to ten by adding two public members to be appointed by the governor. *Id*. § 1 at 213-14.

In 2000, the legislature amended Idaho Code section 54-1806A to require the board of medicine to create a board of professional discipline. Ch. 332, § 1, 2000 Idaho Sess. Laws 1111, 1112. However, the board of professional discipline had "no authority to impose sanctions or limitations or conditions on licenses issued under [Chapter 54] and [was] authorized only to make recommendations to the board with respect [to professional discipline]. *Id*.

**The Disabled Physician Act.** The legislature enacted the Disabled Physician Act in 1976. Ch. 290, §§ 1-11, 1976 Idaho Sess. Laws 1000, 1000-07 (codified as Idaho Code §§ 54-1831 to 54-1840). The Act was not subsequently amended when the legislature amended the statutes regarding medical discipline. The Act applies to a physician who is unable to practice medicine with reasonable skill or safety to patients due to mental illness, physical illness, and/or excessive use or abuse of drugs, including alcohol. I.C. § 54-1832.

6

In the 1899 legislation, "[h]abitual intemperance in the use of ardent spirits, narcotics, or stimulants" constituted unprofessional or dishonorable conduct for which a physician's license could be suspended, revoked, or cancelled. 1899 Idaho Sess. Laws 345, 348.

In 1929, the legislature revised the grounds for medical discipline. Those grounds included: (a) "Being addicted to the use of intoxicants or drugs to such a degree as to render the licensee unsafe or unfit to practice medicine and surgery or any branch thereof" and (b) "Having been declared insane by a court of competent jurisdiction and not thereafter having been lawfully declared sane." Ch. 178, § 1, 1929 Idaho Sess. Laws 313, 314.

In 1949, the legislature again amended the grounds for medical discipline. The grounds included: (a) "Being addicted to the use of drugs or intoxicants to such a degree as to render the licensee unsafe or unfit to practice medicine and surgery" and (b) "Having been declared insane by a court of competent jurisdiction; provided, however, that when a licensed person's license shall have been revoked or suspended for this cause, such license may be reinstated by the Board upon a declaration of sanity being made." Ch. 23, § 10, 1949 Idaho Sess. Laws 27, 36.

In 1969, the legislature again amended the grounds for medical discipline. The grounds included: (a) "Having been adjudged imcompetent [sic] and a danger to himself or herself on grounds of mental illness by a court of competent jurisdiction in this state, or elsewhere"; (b) "Habitual intemperance in the use of alcohol"; and (c) "Habitual use of narcotic, hypnotic or hallucinogenic drugs." Ch. 84, § 10, 1969 Idaho Sess. Laws 237, 251-52.

In 1976, the legislature enacted the Disabled Physician Act. In 1977, the legislature repealed the statute setting forth the grounds for medical discipline and enacted a new Idaho Code section 54-1814 setting forth such grounds. The new statute did not include any ground related to the physician's abuse of alcohol or drugs or related to the physician's mental illness. Thus, it is clear that the proceedings under the Disabled Physician Act and proceedings for medical discipline are separate and distinct proceedings.

**References to medical discipline in the Final Order.** The prefatory language in the Final Order entered by the Board in this case did include provisions that on their face indicated that the Board combined the Medical Practice Act with the Disabled Physician Act. The order appointing the examining committee expressly stated that it was issued pursuant to the Disabled Physician Act. The Final Order did not mention that Act and instead recited, "The Medical

Practice Act and Board Rules provide grounds for professional *discipline*." (Emphasis added.) The Disabled Physician Act does not provide for discipline.

The prefatory language in the Final Order stated that prior to the meeting at which the Board made its decision, "members of the Board and Committee on Professional Discipline ('COPD') signed Certificates of Approval averring their findings would be based exclusively on the evidence in the record"; that "[a]fter consideration and upon COPD recommendation, the Board acted to adopt the *Recommended Findings* in toto after determining the principal issues in this contested case hearing were appropriately adjudicated"; and that "[t]he Board, after careful review and consideration of the record of this matter as well as the COPD's recommendation, hereby makes the following *Final Order*." The COPD only has "the authority under the direct supervision and control of the board to conduct *professional disciplinary enforcement investigations* under this chapter and particularly under sections 54-1810 and 54-1814, Idaho Code, and to recommend appropriate action to the board with respect thereto." I.C. § 54-1806A (emphasis added). The Disabled Physician Act does not include any role for the COPD.

The Final Order stated that the Board was imposing sanctions. The prefatory language stated that the Board "deemed *sanctions* were necessary," and under the heading "Final Order," the order stated, "Based upon the foregoing, IT IS HEREBY ORDERED that the following *sanctions* to Respondent's license to practice medicine in Idaho shall occur." (Emphases added.) Sanctions are imposed in connection with medical discipline, but not under the Disabled Physician Act. In Chapter 18 of Title 54, the word *sanctions* only appears in Idaho Code section 54-1806A, which requires the board of medicine to create a committee on professional discipline. With respect to that committee, the statute states that it "shall have no authority to impose sanctions or limitations or conditions on licenses issued under this chapter and shall be authorized only to make recommendations to the board with respect thereto." I.C. § 54-1806A.

One of the sanctions listed in the Final Order was, "Respondent shall *permanently* cease from practicing obstetrics and chronic pain management." (Emphasis added.) Under the Disabled Physician Act, the board of medicine cannot impose a permanent suspension or restriction. Any suspension or restriction of the physician's license can continue only "for the duration of his impairment." I.C. § 54-1837(c)(2). The statute says "duration of his impairment," not "duration of his medical condition." If, with treatment, the physician is able to

8

practice medicine with reasonable skill and safety to patients, then the suspension or restriction of the physician's license must cease.

The district court agreed with Dr. Mena that the Board's use of the word *sanctions* and its imposition of a permanent restriction on Dr. Mena's license from practicing obstetrics and chronic pain management created "a reasonable basis for this proceeding arising from the board's mixing of statutory remedies and the board's use of the language of sanctions which in this context moves the case from protection of the public and rehabilitative to punishment, which implies moral deficiency or intentional bad conduct." The Board argues that the language in the Final Order is immaterial because "all of the Board proceedings were within and under the Disabled Physician Act process" and that "[i]t is simply not correct that the options available to the Board are different between a disciplinary proceeding and a Disabled Physician Act proceeding." The Board's arguments in this regard are erroneous.

First, although both Idaho Code section 54-1806A(9) (relating to medical discipline) and Idaho Code section 54-1837(c) (part of the Disabled Physician Act) provide that the board of medicine can revoke, suspend, or restrict the physician's medical license, that does not mean that restrictions that could only be imposed in connection with medical discipline can also be imposed under the Disabled Physician Act. In *Haw v. Idaho State Board of Medicine*, 143 Idaho 51, 137 P.3d 438 (2006), we held with respect to imposing disciplinary sanctions, "The guiding principle is that the sanction must be related to the discipline; I.C. § 54-1806A(9) does not authorize an open-ended sanction simply because some form of discipline has been imposed." *Id*. at 54, 137 P.3d at 441. The same rationale applies to the Disabled Physician Act. A finding that the physician is unable to practice medicine with reasonable skill or safety to patients due to a mental illness would not authorize the board of medicine to impose restrictions that are sanctions unrelated to the mental illness or its impact upon the physician's inability to practice medicine with reasonable skill or patient safety. For example, the sanctions imposed as medical discipline pursuant to the Stipulation and Order dated July 16, 2009, included a provision requiring Dr. Mena to permanently cease performing obstetrics and treating chronic pain. That sanction was originally imposed due to Dr. Mena's lack of knowledge in those two areas. The lack of knowledge is not a mental illness. A finding that Dr. Mena was within the purview of the Disabled Physician Act would not, by itself, authorize the Board to reimpose that sanction. The Board also argues that the restriction regarding obstetrics and pain management can be justified

9

by the Stipulation and Order. It cannot be so justified because on September 26, 2011, the Board terminated the Stipulation and Order.

Second, sanctions can be imposed as a medical discipline only if the physician engaged in conduct that constitutes a ground for medical discipline. Idaho Code section 54-1814 states that a physician "is subject to discipline by the board pursuant to the procedures set forth in this chapter and rules promulgated pursuant thereto upon any of the following grounds."[1] "The holder of a professional license has a valuable property right protected by the safeguards of due process. In order to satisfy due process, the complaint must specify the particular acts of unprofessional conduct alleged." *Cooper v. Bd. of Prof'l Discipline of Idaho State Bd. of Med.*, 134 Idaho 449, 454, 4 P.3d 561, 566 (2000). The fact that the Board followed the procedures under the Disabled Physician Act does not justify imposing disciplinary sanctions where the Board failed to follow the required procedures for doing so.

Idaho Code section 54-1806A(9) (specifying the sanctions available in medical disciplinary proceedings) and Idaho Code section 54-1837(c) (specifying the types of orders available under the Disabled Physicians Act) differ in other ways.

The sanctions under section 54-1806A(9) also include:

> (c) Imposing conditions or probation upon the respondent physician and requiring rehabilitation planning, commitment and conditions upon such respondent physician's licensure;
> (d) Imposing an administrative fine not to exceed ten thousand dollars ($10,000) for each count or offense; and/or
> (e) Assessing costs and attorney's fees against the respondent physician for any investigation and/or administrative proceeding.

I.C. § 54-1806A(9). The Disabled Physician Act does not authorize the actions listed above in subsections (c), (d), and (e) of Idaho Code section 54-1806A(9). I.C. § 54-1837(c). Under the Disabled Physician Act, the board of medicine cannot impose conditions or probation. *Id*. It is only authorized to "[m]ake a recommendation that the physician submit to the care, counseling, or treatment by physicians acceptable to the board." I.C. § 54-1837(c)(1).

The Disabled Physician Act does permit the board of medicine to restrict the physician's license, Idaho Code section 54-1837(c)(2), as does Idaho Code section 54-1806A(9)(b). The

---

[1] The board of medicine had adopted a rule setting forth additional grounds for medical discipline. IDAPA 22.01.01.101. We express no opinion regarding its authority to adopt a rule adding grounds for medical discipline.

legislature did not define "restrict." Because subsection (b) of section 54-1806A(9) permits restricting the physician's license and subsection (c) of the statute permits imposing conditions or probation upon the physician, restricting the license must be some action other than imposing conditions or terms of probation. For example, the Federation of State Medical Boards defines *probation* as "Physician's practice is monitored for a specific period of time" and *restriction* as "Physician's license to practice is restricted in some way; e.g. prohibited from performing specific procedures."[2]

The Disabled Physician Act likewise does not include a provision permitting the board of medicine to impose an administrative fine or to assess costs and attorney fees. I.C. § 54-1837(c). In its Final Order, the Board ordered Dr. Mena to reimburse it for its attorney fees pursuant to Idaho Code section 54-1806(11). That statute does not permit the Board to assess attorney fees. It states that the board of medicine has authority to "Provide for reasonable fees through rules for administrative costs and assess costs reasonably and necessarily incurred in the enforcement of this chapter when a licensee has been found to be in violation of the provisions of this chapter." Neither the word "fees" nor the word "costs" authorizes the award of attorney fees. The statute refers to "fees," not "attorney fees." The legislature knows how to specify attorney fees. Section 54-1806(11) was added in 1977. Ch. 199, § 7, 1977 Idaho Sess. Laws 536, 542. In the same legislation, the legislature provided that a person who was the recipient of services that constituted the unlawful practice of medicine could recover against the provider of such services "[r]easonable attorney fees and court costs." Ch. 199, § 5, 197 Idaho Sess. Laws 536, 540. The "fees" mentioned in section 54-1806(11) are to be set "through rules for administrative costs." I.C. § 54-1806(11). That is not the manner in which an award of attorney fees is typically set, and the Board has not cited any rules setting attorney fee awards. Idaho Code section 54-1806(11) also provides for the assessment of "costs" against a licensee found to be in violation of Chapter 18 of Title 54, but the word "costs" does not include attorney fees. *Telford Lands LLC v. Cain*, 154 Idaho 981, 992, 303 P.3d 1237, 1248 (2013); *Roe v. Albertson's, Inc*., 141 Idaho 524, 531, 112 P.3d 812, 819 (2005). Likewise, Idaho Code section 54-1806(11) only permits the board of medicine to "assess costs reasonably and necessarily incurred in the enforcement of this chapter when a licensee has been found to be in violation of the provisions of this chapter." Dr. Mena was not found to be in violation of the provisions of Chapter 18 of Title 54.

---

[2] http://www.fsmb.org/policy/advocacy-policy/government-affairs/ (accessed March 14, 2016).

Even though the Final Order on its face appeared to impose disciplinary sanctions when no disciplinary proceedings had been commenced, the district court upheld the Final Order. The court concluded: "The sum of this discussion is that the record in this case supports the limitations upon the doctor's practice under I.C. § 54-1837(c)(2). The record does not justify those limitations upon the doctor's practice as a punishment for his disabilities or for contesting the proceedings."

On March 17, 2015, the Board issued an Amended Final Order Following Appeal, which simply removed the prefatory language mentioning discipline and changed the word *sanctions* to *restrictions* in the order. However, the amended order retained the provision that "Respondent shall *permanently* cease from practicing obstetrics and chronic pain management" (emphasis added), which cannot be ordered under the Disabled Physician Act. We need not decide whether the Board combined the disciplinary proceedings under the Medical Practice Act with proceedings under the Disabled Physician Act because this appeal can be resolved on the ground of the sufficiency of the evidence.

**Sufficiency of the evidence.** When the district court acts in its appellate capacity pursuant to a petition for judicial review, we review the decision of the district court to determine whether it correctly decided the issues presented to it on appeal. *Pines v. Idaho State Bd. of Med.*, 158 Idaho 745, 750, 351 P.3d 1203, 1208 (2015). When doing so, we conduct our own review of the agency record. *Id.*

In this case, the Board contended that Dr. Mena had a mental illness that made him unable to practice medicine with reasonable skill or safety. The Board's compliance monitor testified before the hearing officer that the Board instituted this proceeding because it became concerned about Dr. Mena's mental health after receiving his letter sent after his hospital privileges were terminated. Dr. Mena's subsequent e-mail to which was attached a conclusion to that letter further contributed to the Board's concern.

The Board commenced these proceedings on May 14, 2012, by issuing the Order Appointing Examining Committee as required by Idaho Code section 54-1833. This proceeding was separate from the Stipulation and Order dated July 16, 2009, which was a disciplinary proceeding. The issue is whether the district court erred in finding that there was substantial evidence supporting the Board's decision.

The Disabled Physician Act states:

The license of any physician to practice medicine in this state shall be subject to restriction, suspension, or revocation, as hereinafter provided, in case of inability of the licensee to practice medicine with reasonable skill or safety to patients by reason of one or more of the following:

    (a) mental illness;

    (b) physical illness, including but not limited to, deterioration through the aging process, or loss of motor skill; or

    (c) excessive use or abuse of drugs, including alcohol.

I.C. § 54-1832.

The provisions of the Disabled Physician Act show that the mental illness, physical illness, or excessive use of drugs must currently exist when the proceedings are instituted. Idaho Code section 54-1833(a) authorizes the board of medicine to commence proceedings under the Disabled Physician Act if it has reasonable cause to believe that the physician "*is* [present tense] unable to practice medicine with reasonable skill or safety to patients" because of one or more of the required conditions. (Emphasis added.) Likewise, upon a finding that a physician comes within the purview of the Disabled Physician Act, the board of medicine can only "[s]uspend or restrict the license of the physician to practice medicine *for the duration of his impairment*." I.C. § 54-1837(c)(2) (emphasis added). If an alleged condition no longer exists, the board of medicine cannot suspend or restrict the license. Finally, Idaho Code section 54-1837(c) states that "if grounds *are not found to exist* [present tense, not "to have existed"], the board shall enter its order so stating [and] shall dismiss the proceedings." (Emphasis added.) Thus, the Board had the burden of proving that when it commenced these proceedings, Dr. Mena was currently unable "to practice medicine with reasonable skill or safety to patients by reason of . . . mental illness." I.C. § 54-1832. In order to make that finding, the board of medicine must be able to identify the alleged mental illness and explain how that mental illness renders the physician unable to practice medicine with reasonable skill or safety to patients.

In upholding the Board's action, the district court stated, "There is evidence that Dr. Mena suffers from mental conditions that adversely impact his ability to practice medicine with reasonable skill or patient safety and which require ongoing psychiatric and/or psychiatric [sic] monitoring." The Board did not make such a finding, and the district court cannot be the finder of fact on appeal. "In the appellate process, neither the district court nor this Court may substitute its judgment for that of the agency as to the weight of the evidence presented in the record." *Levin v. Idaho State Bd. of Med.*, 133 Idaho 413, 417, 987 P.2d 1028, 1032 (1999).

13

The evidence presented to the hearing officer only included two items that were indicative of Dr. Mena's current mental state. The hearing officer recognized that "[t]he most pertinent recent information regarding Dr. Mena's impairment is the report of the examining committee and Dr. Beaver's 2012 evaluation."

The examining committee consisted of two board-certified psychiatrists and a board-certified family-practice physician. On June 19, 2012, they interviewed Dr. Mena for ninety minutes. The committee listed in its report various documents it had reviewed, but none of them appear to have contained a current evaluation of Dr. Mena's mental functioning except possibly the last item listed, which was "Treating Psychiatrist's letter to the Board." That may have referred to the letter dated January 3, 2012, that Dr. Mena's treating psychiatrist, Dr. Albright, had sent to the Board. Dr. Beaver discussed that letter in his later report dated September 10, 2012. He stated:

> Dr. Albright sent another letter dated 01/03/2012 to that [sic] Idaho Board of Medicine regarding Dr. Mena. He noted Dr. Mena had not been diagnosed with any psychiatric illness that would interfere with his duties as a physician and he did not see any reason why his license should be withheld. . . . Dr. Albright noted his evaluation had noted depression of mild to moderate level treated easily with antidepressant.

In its report, the examining committee stated that it discussed with Dr. Mena "prior examinations [that] revealed that [Dr. Mena] has been found to have Obsessive–Compulsive and Narcissistic personality traits" and "evidence for deficits in Cognitive processing speed - demonstrated on Neuropsychological testing." The deficits in cognitive processing speed were identified when Dr. Mena was at the Betty Ford Clinic in 2007.[3] The examining committee did not identify any mental illness from which Dr. Mena may have been currently suffering, and it stated that "[w]e do not feel that requiring a formal Psychiatric evaluation at this time would be helpful." The committee concluded "that Dr. Robert Mena can continue his present practice of medicine with reasonable skill and safety, with required management including: Repeat

---

[3] During the PACE evaluation in 2008, Dr. Mena performed poorly on a computer-based assessment of cognitive skills. It was a screening instrument only, not a diagnostic tool. The report noted that during the examination, Dr. Mena took time to answer a phone call while believing that the computer program had paused. As a result, the report stated that the results were inconclusive. The report concluded: "However, we did not observe any behaviors that would indicate that Dr. Mena has a cognitive impairment. Therefore, we are not recommending that he undergo a full neuropsychological evaluation at this time."

Neuropsychological testing by Dr. Craig Beaver[;] Continued outpatient Psychiatric care[; and] Reevaluation in two years, with continuing Board oversight."

After the examining committee submitted its report, Dr. Beaver did repeat neuropsychological testing of Dr. Mena on September 6, 2012. He found that the "[n]eurocognitive evaluation of Dr. Mena generally found him performing within normal limits in the average range of abilities"; that "[t]here was no evidence on this examination of attention deficit issues"; and that "[h]is capacity to reason and problem solve was adequate."

Based upon his psychological assessment of Dr. Mena, Dr. Beaver stated that "no major psychological difficulties were identified on the two psychological tests administered to him." Dr. Beaver added that Dr. Mena "still presents as a very confident individual with some narcissistic features," that "[t]here was less evidence of obsessive compulsiveness at this time," and that Dr. Mena "did not show evidence of depression or anxiety at this time."

Dr. Beaver diagnosed Dr. Mena with probable obsessive compulsive disorder that was in remission and continuing narcissistic personality traits. Dr. Beaver concluded that "[f]rom a neurocognitive perspective, I did not observe any neurocognitive deficits that would interfere with his capacity to engage in clinical practice as a family practice physician." Based upon Dr. Mena's prior history of concerns, Dr. Beaver recommended that Dr. Mena engage in individual counseling "to ensure that some of his personal dynamics do not again create difficulties for him."

In his Recommended Findings of Fact and Conclusions of Law, the hearing officer did not find that Dr. Mena had any identifiable mental illness that made him unable to practice medicine with reasonable skill or safety to patients. Rather, he concluded:

> The only question here is whether there is information to determine that grounds exist to find *some level of disability or impairment*. Those grounds do exist.
> *While the level of impairment may be debatable*, it is clear and convincing that *some level of impairment exists*. Therefore, the Board is in a proper position, in its discretion, to issue an order imposing one or more of the three (3) potential orders found in Idaho Code § 54-1837(c).

(Emphases added.) The hearing officer did not identify the "impairment," nor did he find that the unspecified impairment made Dr. Mena unable to practice medicine with reasonable skill or safety to patients.

15

The Board agreed with that finding, that *some level of impairment exists*. In its Final Order, the Board noted that at its meeting on December 6, 2013, it had adopted the hearing officer's entire Recommended Findings of Fact and Conclusions of law. The Board then stated: "The Board particularly concurs with the *Recommended Findings* that there is clear and convincing evidence that Respondent suffers from 'some level of impairment.'" Dr. Mena filed a motion for reconsideration. In its order denying that motion, the Board wrote, "Upon deliberation, the Board again determined there was clear and convincing evidence that Respondent suffers from 'some level of impairment' that *may impact* his provision of medical care with reasonable skill and safety." (Emphasis added.)

The Board's own evaluation of the evidence shows that there was insufficient evidence to support the Board's order. In order for the Board to find that Dr. Mena was within the purview of the Disabled Physician Act, it was required to find: (a) that he had mental illness and (b) that such mental illness made him unable to practice medicine with reasonable skill or safety to patients. I.C. § 54-1832. Both findings must be based upon expert testimony. Neither the hearing officer nor the Board identified the current mental illness that Dr. Mena had that allegedly impacted his ability to practice medicine. There was no expert testimony that Dr. Mena was, due to such mental illness, currently unable to practice medicine with reasonable skill or safety to patients. *Some* level of an undefined impairment that *may impact* Dr. Mena's provision of medical care with reasonable skill and safety is not a sufficient finding to bring Dr. Mena within the purview of the Disabled Physician Act. The Act requires a finding that he currently has an "*inability* . . . to practice medicine with reasonable skill or safety to patients by reason of . . . mental illness." I.C. § 54-1832. (Emphasis added.) No such finding was made by the Board in this case.

The Board's order may be overturned where it is "not supported by substantial evidence on the record as a whole." I.C. § 67-5279(3)(d). The Board's factual findings show that the Final Order in this case was not supported by substantial evidence. Subsection (4) of Idaho Code section 67-5279 states, "Notwithstanding the provisions of subsections (2) and (3) of this section, agency action shall be affirmed unless substantial rights of the appellant have been prejudiced." Dr. Mena's substantial rights have been prejudiced. The Final Order imposed nine separate requirements regarding his future conduct, in addition to the award of attorney fees to the Board.

16

Idaho Code section 67-5279(3) provides, "If the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings as necessary." In this case, the Final Order must be set aside in whole. Therefore, we reverse the judgment of the district court and remand this case with instructions to vacate the Final Order and remand this matter to the Board.

### III.
### Is the Board Entitled to an Award of Attorney Fees on Appeal?

The Board requests an award of attorney fees on appeal pursuant to Idaho Code section 12-117. Under that statute, attorney fees can only be awarded to the prevailing party. *Telford v. Smith County, Texas*, 155 Idaho 497, 504-05, 314 P.3d 179, 186-87 (2013). Because the Board is not the prevailing party on appeal, it cannot be awarded attorney fees.

### IV.
### Conclusion.

We reverse the judgment of the district court with instructions to vacate the Final Order of the Board and remand the matter to it. We award Appellant costs on appeal.

Chief Justice J. JONES, Justices BURDICK, W. JONES and HORTON **CONCUR.**